Opinion
 

 HOLLENHORST, J.
 

 These consolidated cases represent two attempts to place defendant on outpatient status from Patton State Hospital, pursuant to
 
 *619
 
 Penal Code section 1600 et seq.
 
 [1]
 
 The trial court refused to authorize outpatient status.
 
 [2]
 

 The first appeal, No. E012545, was filed after a hearing on January 14 and 15, 1993. The second appeal, No. E013445, was filed after a hearing in August 1993. The two appeals were consolidated for hearing in this court.
 

 Facts
 
 [3]
 

 On April 6, 1988, defendant came to collect rent from his tenant, Ramzi Farahat El Du-Waik. He stayed and had a friendly discussion of the Islamic religion with Mr. Du-Waik.
 

 The following Sunday, April 10, 1988, defendant walked into Mr. Du-Waik’s house unannounced, said hello to Mr. Du-Waik, and shot him at least three times without warning, killing him. Defendant told the doctors that God had commanded him to kill Mr. Du-Waik.
 

 Defendant’s plea of guilty to the murder was accepted by the trial court. The trial court subsequently fixed the degree of the murder at second degree, found defendant not guilty by reason of insanity, and ordered defendant committed to Patton State Hospital for a maximum commitment term of 17 years to life. (§ 1026.) The commitment date was March 22, 1989.
 

 Issues
 

 An issue common to both appeals is the issue of the allocation of the burden of proof in outpatient status hearings. If, as the trial court found, the defendant bears the. burden of proof, the question is whether this procedure is constitutional. A second issue in both cases is whether the trial court abused its discretion in denying outpatient status.
 

 Other issues in the second appeal are whether the trial court was impartial and whether it improperly based its decision on defendant’s religious beliefs.
 

 Background
 

 When the trial court finds that defendant was insane at the time of the offense, it may commit defendant to a state hospital or certain public or
 
 *620
 
 private treatment facilities, or it may order defendant placed on outpatient status pursuant to section 1600 et seq. (§ 1026, subd. (a).) Here, the trial court committed defendant to Patton State Hospital for a maximum term of 17 years to life.
 

 Upon such a commitment, the medical director of the facility submits semi-annual reports to the court. (§ 1026, subd. (f).) In a report dated August 18, 1992, the Patton medical director found that defendant was no longer dangerous and recommended that defendant be placed on outpatient status pursuant to section 1603, subdivision (a)(1).
 

 A person may be released from a state hospital (1) upon restoration of sanity pursuant to the provisions of section 1026.2, (2) upon expiration of the maximum term of commitment under section 1026.5
 
 (In re Moye
 
 (1978) 22 Cal.3d 457, 466-467 [149 Cal.Rptr. 491, 584 P.2d 1097]), or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1.)
 

 Under the latter procedure, a defendant may be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the trial court approves the recommendation after hearing. (§ 1603.) “Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.”
 
 (People
 
 v.
 
 Wymer
 
 (1987) 192 Cal.App.3d 508, 513 [237 Cal.Rptr. 301].)
 

 Following the recommendation of the state hospital director, defendant was evaluated by the staff of the conditional release program. The staff recommended that defendant be placed on outpatient status. Accordingly, hearing was set for the court to consider the recommendation. (§ 1603, subd. (a)(3); see generally,
 
 People
 
 v.
 
 Wymer, supra,
 
 192 Cal.App.3d 508, 512].)
 

 Outpatient status is a prerequisite to a finding that sanity has been restored. (§ 1026.2.) “Subdivision (e) of section 1026.2 sets up a two-step process for processing an application for release: first, a determination of whether the applicant should be placed in a local program, and later, after a year in such a program, a determination of whether the applicant’s sanity has been restored.”
 
 (Barnes
 
 v.
 
 Superior Court
 
 (1986) 186 Cal.App.3d 969, 973 [231 Cal.Rptr. 158];
 
 People
 
 v.
 
 Tilbury
 
 (1991) 54 Cal.3d 56, 60 [284 Cal.Rptr. 288, 813 P.2d 1318] [no right to jury trial on outpatient placement].) At the end of one year, the trial court may either discharge the
 
 *621
 
 defendant, order confinement in a treatment facility, or renew its approval of outpatient status.
 
 [4]
 
 (§ 1606.)
 

 Burden of Proof
 

 In a restoration of sanity hearing, the applicant has the burden of proof by a preponderance of the evidence. (§ 1026.2, subd. (k).) However, the statute does not specify who has the burden of proof in an outpatient status hearing.
 

 The first outpatient status hearing was held on January 14-15,1993. At the beginning of the hearing, the trial court noted this uncertainty. It found that, since the hearing was the first step in a restoration of sanity proceeding, it would be inconsistent to apply a different standard in each hearing. The trial court also noted that, since defendant had committed a violent crime while insane, it would be fair to require defendant to prove that he was no longer dangerous. The trial court therefore placed the burden of proof on defendant under a preponderance of the evidence standard.
 

 We agree with the trial court that the outpatient release procedure is an integral part of the restoration of sanity procedure stated in section 1026.2, and that placement of the burden of proof on defendant is proper.
 

 Section 1026.2, subdivision (e) provides, in part: “The court shall hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community. If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year.”
 

 These provisions are consistent with the overlapping provisions of sections 1602 and 1604. For example, section 1604, subdivision (c), provides that the court shall approve or disapprove the recommendation for outpatient status, after considering “the circumstances and nature of the criminal offense leading to commitment and shall consider the person’s prior criminal history.”
 

 We therefore agree with the trial court that the defendant had the burden of proving he met the conditions for his release by a preponderance of the evidence.
 

 
 *622
 
 Constitutionality of Placing the Burden of Proof on the Defendant
 

 Defendant contends that, so interpreted, the procedure denied him due process because due process requires that the state bear the burden of proving both mental illness and dangerousness in order to justify his continued confinement. Specifically, he argues that “[t]here is only one aspect of [defendant’s] mental illness which is directly related to dangerousness, and that is when he experienced command hallucinations while in a psychotic state. The evidence could not be more clear that as long as he is not hearing little voices telling him to kill, he not only is not dangerous, but he should be able to function as a normal member of society. In the absence of
 
 any
 
 evidence of such hallucinations, all other evidence points only toward mental illness, which alone cannot be the basis for further commitment.”
 

 In
 
 Jones
 
 v.
 
 United States
 
 (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043], the Supreme Court upheld a District of Columbia statute that required a defendant who was acquitted by reason of insanity, and committed to a mental institution, to prove that he was no longer insane or dangerous by a preponderance of the evidence in order to be released. In that case, defendant was hospitalized for a longer period than he would have served in prison if convicted.
 

 The Supreme Court first found that"... a finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society.”
 
 (Jones
 
 v.
 
 United States, supra,
 
 463 U.S. 354, 366 [77 L.Ed.2d 694, 706].) The fact of conviction was also sufficient evidence that defendant was dangerous. Under the District of Columbia statute, as under ours, the defendant had the opportunity to show, after a period of time, that he had recovered, and therefore should be released.
 
 (Id.,
 
 at pp. 364-366 [77 L.Ed.2d at pp. 705-706].)
 

 The court
 
 next
 
 held that the preponderance of the evidence standard met due process requirements, even though civil commitment procedures used a clear and convincing evidence standard.
 
 (Jones
 
 v.
 
 United States, supra,
 
 463 U.S. 354, 366-368 [77 L.Ed.2d 694, 706-708].) Accordingly, an insanity acquittee was entitled to release when he has recovered his sanity or is no longer dangerous. “We hold that when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society.”
 
 *623
 

 (Id.,
 
 at p. 370 [77 L.Ed.2d at p. 709]; cf.
 
 O’Connor
 
 v.
 
 Donaldson
 
 (1975) 422 U.S. 563, 575 [45 L.Ed.2d 396, 406-407, 95 S.Ct. 2486] [civil commitment requires both mental illness and dangerousness].)
 

 Under
 
 Jones,
 
 California may use the findings in the criminal proceeding as the basis for commitment on grounds that those findings show both insanity and dangerousness. (§ 1026; cf.
 
 Medina
 
 v.
 
 California
 
 (1992)_U.S. _[120 L.Ed.2d 353,112 S.Ct. 2572] [competence to stand trial].) Defendant was therefore properly committed.
 

 Defendant primarily relies on the more recent Supreme Court case of
 
 Foucha
 
 v.
 
 Louisiana
 
 (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780]. In that case, defendant Foucha was found not guilty by reason of insanity and was committed to an institution. Subsequently, the doctors certified that he was no longer mentally ill but they would not certify that he was no longer dangerous. Specifically, they testified that he had an antisocial personality, an untreatable condition that is not a mental disease.
 
 (Id.,
 
 at p._ [118 L.Ed.2d at pp. 444-445].)
 

 The Supreme Court in
 
 Foucha
 
 endorsed the portion of
 
 Jones
 
 which differentiated between civil commitment proceedings and proceedings in which a criminal defendant is found not guilty by reason of insanity. (See, generally,
 
 People
 
 v.
 
 Tilbury, supra,
 
 54 Cal.3d 56, 63];
 
 Addington
 
 v.
 
 Texas
 
 (1979) 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804] [burden of proof in civil commitment proceedings].) In the latter proceedings, the verdict supported the inference that defendant was still mentally ill and dangerous and hence could be committed.
 
 (Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. at p._ [118 L.Ed.2d at pp. 445-446].) However, since Mr. Foucha was no longer mentally ill, he could no longer be held in a mental institution, even if he was dangerous.
 
 (Id.,
 
 at p__ [118 L.Ed.2d at p. 447.) Thus, Mr. Foucha was entitled to be released if he had recovered his sanity
 
 or
 
 if he was no longer dangerous.
 

 Defendant relies on the portion of
 
 Foucha
 
 which discusses the contention that Louisiana could confine defendant if it showed that he was mentally ill and dangerous. Under the Louisiana statute, the state placed the burden of showing that he was not dangerous on defendant. The court found the statute violated due process because it “permits the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others.”
 
 (Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. 71, _ [118 L.Ed.2d 437, 450].)
 

 This is not the case here. First, defendant here conceded insanity but contends that he is no longer dangerous.
 
 Foucha
 
 considered the opposite
 
 *624
 
 situation: Mr. Foucha was not insane, but was dangerous. Second, under the California procedure, defendant Sword was found guilty of second degree murder and was also found not guilty by reason of insanity. (§ 1026.) He was committed to the institution for 17 years to life.
 
 [5]
 
 The period of actual confinement in the mental hospital has been far less than the term he would have served in prison for the offense.
 
 [6]
 
 Third, defendant Sword concededly has a mental illness, and always will. The mental illness is controlled by medication, but there is a danger that it will manifest itself and become a danger if defendant does not take the medication.
 

 We find no due process problem with the California procedure. Under
 
 Jones,
 
 the fact of the criminal conviction provides a basis for inferring that defendant is both mentally ill and dangerous, and may therefore be committed. Under
 
 In re Franklin
 
 (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], there is a presumption of continued insanity: “. . . it is reasonable to presume under such circumstances that defendant’s insanity, established by a preponderance of the evidence, has continued to the date of trial.”
 
 (Id.,
 
 at p. 141.) The term “date of trial” refers to the trial on present sanity, i.e., the release hearing.
 
 (People
 
 v.
 
 Tilbury, supra,
 
 54 Cal.3d 56, 66.) This portion of
 
 Franklin
 
 is consistent with
 
 Jones. (Ibid.)
 

 To be restored to sanity, defendant has the burden of proving, by a preponderance of the evidence, that he is either no longer mentally ill or not dangerous. (§ 1026.2, subd. (k).) There is nothing unusual about placing this burden of proof on defendant.
 
 [7]
 
 (1 LaFave & Scott, Substantive Criminal Law (1986) § 4.6, pp. 509-522.) We therefore find that the trial court correctly decided that defendant bears this burden of proof in an outpatient status hearing.
 

 Did The Trial Court Abuse Its Discretion in Finding That Defendant Did Not Meet His Burden of Proof in Either Hearing?
 

 Having found no constitutional infirmity in requiring defendant to prove that he is not dangerous, we consider whether the trial court abused its
 
 *625
 
 discretion in rejecting the conclusions of the doctors and other experts that he would not be dangerous on outpatient status.
 

 In both hearings, the witnesses uniformly testified that, in their opinion, defendant was no longer dangerous. In both hearings, the trial court rejected that testimony on the basis of perceived gaps in their understanding or knowledge of events shown in defendant’s file, and their failure to consider certain facts.
 

 In the January 1993, hearing, Dr. Kasper, a psychiatrist at Patton, testified that defendant would not be a danger to himself or others if placed on outpatient status. The doctor felt there was an 85 percent probability that defendant would comply with the terms of outpatient placement.
 
 [8]
 

 Dr. Sena, a clinical therapist in the community release program, testified that he thought that defendant was ready for outpatient release. Dr. Sena was unaware of a symptomatic episode in July 1992, and conceded that, if he had been aware of it, he would not have recommended outpatient status.
 

 The trial court found that defendant continued to be a danger to the health and safety of others, and denied outpatient status. It rejected the doctors’ opinions because it found that the opinions were not supported by the notes in defendant’s file.
 

 In the August 1993, hearing, Dr. Kasper again testified that he was the head of defendant’s treatment team at Patton and it was his opinion that, if defendant was supervised by the outplacement program, he would not be dangerous. He also testified that there had been no improvement or change in defendant’s condition since the earlier hearing.
 

 Dr. Reed, a staff psychologist at Patton, testified that it is her opinion that defendant is no longer dangerous and could be adequately treated in the community under supervision and treatment. She based that opinion on his history, the nature of the offense, the length of time in treatment, and his progress in that treatment. However, she testified that it is possible that he could become dangerous if there were stressful events occurring while he was an outpatient, if he failed to take his medication, or if his illness manifested itself for other reasons. In other words, “we can’t cure the illness that he has. We can only hold it in remission and try to treat the active symptoms.”
 

 Dr. Kania, a clinical psychologist in private practice, testified that it was his opinion that defendant was not dangerous and was a suitable candidate
 
 *626
 
 for outpatient treatment. In determining dangerousness, he looked at behavior at the hospital and psychological factors that led to the violent episode in 1988. There was no history of violent or assaultive behavior, or threats of such behavior, at Patton. The psychological factors that led to past outbursts included stress, financial, marital and health problems. Dr. Kania testified: “At this point I think he has made significant changes in his behavior and the way he interacts with people. He also has some insight into them [on an] intellectual level. So, he is able to further himself and further benefit from therapy, if he were to be in the community. But he has made substantial progress, to the point that he is at this time not dangerous.”
 

 Mark Daniels, a social worker employed by the conditional release program, testified that the program’s team had reviewed the file and found that defendant would be a suitable candidate for outpatient treatment under the close supervision provided by the program. Specifically, the program felt that defendant would not be dangerous if he took his medication and his stress levels were closely monitored.
 

 In both hearings, the prosecution did not put on any expert witnesses to support its argument of dangerousness. Defendant therefore urges that he met his burden of proof by uncontradicted evidence that far exceeded the preponderance of the evidence burden placed on him. He also argues that the trial court abused its discretion in failing to decide the case in accordance with the overwhelming weight of the evidence.
 

 There was certainly ample evidence of lack of dangerousness presented in both hearings. The issue, therefore, becomes whether the trial court abused its discretion in deciding the case contrary to the weight of the evidence.
 

 “The term judicial discretion implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. [Citation.] ‘When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.]’ [Citation.] Discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.”
 
 (People
 
 v.
 
 Henderson, supra,
 
 187 Cal.App.3d 1263, 1268.)
 

 We therefore consider whether the record demonstrates reasons for the trial court’s disregard of the opinion of the treating doctors and other specialists who testified that defendant was no longer dangerous. The
 
 Henderson
 
 court, facing the same situation, considered whether the trial court
 
 *627
 
 relied on the proper factors, and whether the factors found some support in the record.
 
 (People
 
 v.
 
 Henderson, supra,
 
 187 Cal.App.3d 1263, 1269.)
 

 At the conclusion of the first hearing, the trial court stated its belief that defendant was dangerous and that transfer of defendant to the community release program would be completely inappropriate. It then stated: “The opinions expressed by the doctors are in no way supported by the week and day-to-day notes that appear in this defendant’s file. The licensed clinical social worker’s] testimony was singularly unimpressive, and I believe incompetent. ... [¶] The fact that [Dr.] Kasper was unaware of the 1975 incidents; [ft] The fact that the three years Patton was diagnosing the person as having a single episode of depression when that was not true; [¶] The fact that they changed the diagnosis from paranoid schizophrenia to major depression to a bipolar disorder and partial remission; [¶] The fact that it was never brought to the CONREP’s attention that he started to decompensate as late as July of 1992, and yet favorable recommendations were made to refer it to the CONREP program a month later; [¶] The fact that in—within a year prior to the time the defendant was referred he was on suicide watch and he had decompensated again, in my view, it’s ridiculous, and their opinions are ridiculous. And I give their testimony virtually no weight, [¶] And so the request is denied.”
 

 It is apparent from the foregoing that the trial court rejected Dr. Kasper’s testimony because Dr. Kasper was assuming that defendant had only one incident of command hallucinations when the record actually reflected a second, serious incident in 1975.
 
 [9]
 
 Dr. Kasper also did not know if defendant had a substance abuse problem with alcohol. Dr. Kasper’s testimony was rejected because Dr. Kasper’s recommendation was not based on all of defendant’s prior history.
 

 The trial court rejected Dr. Sena’s testimony because Dr. Sena was unaware of an incident in July 1992, in which defendant was talking to himself in the courtyard at Patton and generally slipping into hypomanic
 
 *628
 
 behavior. Dr. Sena testified that, if he had been aware of the hypomanic episode in July 1992, he would not have recommended outpatient status.
 

 The reasons stated by the trial court are not arbitrary, capricious, or an abuse of discretion. As noted above, an application for outpatient status requires the concurrence of the director of the state hospital, the community program director, and the trial court. (§ 1602.) Each has a different viewpoint and different role in evaluating defendant. Section 1604, subdivision (c) requires the trial court to “consider the circumstances and nature of the criminal offense leading to commitment and shall consider the person’s prior criminal history.”
 

 The release decision is not solely a medical or expert decision. The court’s role is to apply a community standard to the release decision: “In a democratic society, we believe, the function of delimiting dangerousness
 
 for release purposes
 
 belongs to the community. Translating community values and policies into an operational definition of dangerousness has been assigned initially to legislators and then to judges as construers of legislative determinations, and not to any particular administrative or professional group, including psychiatrists.” (Goldstein & Katz,
 
 Dangerousness and Mental Illness, Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity (1960) 70
 
 Yale L.J. 225, 230
 
 (Goldstein & Katz).)
 
 Accordingly, the judge’s role is not to rubber-stamp the recommendations of the Patton doctors and the community release program staff experts. Those recommendations are only prerequisites for obtaining a hearing. (§ 1602.) The fact that the statute requires the trial court to approve or disapprove the expert’s recommendations shows the discretion placed in the trial court. (§ 1604, subd. (d).)
 

 “The unspoken premise of [defendant’s] argument is that a committing court need not question or traverse the medical opinion with the help of a citizen jury, but need simply ‘rubber stamp’ a release recommendation. Obviously, this is not contemplated by statute; it is still the judiciary, not the medical experts, which decides whether to release a defendant who has been found to have committed a criminal act while insane.”
 
 (People
 
 v.
 
 Superior Court (Almond)
 
 (1990) 219 Cal.App.3d 607, 612 [268 Cal.Rptr. 375].)
 

 “The task of defining and redefining, on the basis of actual cases, the meaning of ‘dangerousness’ for release purposes has been delegated to the courts and mental health administrators. The desirability of this procedure, in terms of reducing threats to community well-being, maximizing individual dignity and, more particularly, minimizing deprivations of liberty, rests upon its capacity to force into view those rarely articulated factors which are
 
 *629
 
 crucial variables in psychiatric and judicial decisions to release or detain. Interaction in specific cases between the court’s inherent interest in civil rights and the psychiatrists’ primary interest in therapy will [] openly define and redefine criteria for release which amalgamate and reflect these values. In addition, by this sharing of responsibility the traditional tasks of each discipline are restored and anxiety concerning community responses toward the release of any given individual can be minimized as a decisional factor.” (Goldstein & Katz,
 
 op. cit. supra,
 
 p. 232, fn. omitted.)
 

 We therefore find that the trial court was not obligated to follow the recommendations of the doctors and other expert witnesses. Instead, it could disregard those recommendations for nonarbitrary reasons.
 
 (People
 
 v.
 
 Henderson, supra,
 
 187 Cal.App.3d 1263, 1269.) The reasons the trial court advanced here were not arbitrary, and, accordingly, the court did not abuse its discretion in denying defendant outpatient status at the first hearing.
 

 The second hearing was longer and more thorough than the first. As described above, four witnesses testified that defendant was not dangerous, and no witnesses testified that defendant was dangerous.
 

 At the conclusion of the second hearing, the trial court stated its reasons for disregarding the expert’s recommendations. First, it thought that the experts had a vested interest in their previous recommendation, that they thought the trial court was wrong at the first hearing, and that they were reasserting their position again. Second, the trial court felt that the question of whether the episodes would come on gradually or suddenly had not been adequately answered. Specifically, it felt that the questions of whether alcohol could trigger the episodes, and whether a failure to take medication could trigger the episodes, were not adequately addressed. Third, the trial court was concerned with defendant’s alleged ability to recognize the signs of his illness and to take medication to control it. Fourth, the trial court was concerned that the community release program had not identified a specific and appropriate plan of treatment for defendant on outpatient status. Fifth, the trial court found a “big gap” in the failure of all of the doctors to examine defendant on his religious beliefs in order to determine whether, for example, his religion commanded him to kill infidels. Since religion, or command hallucinations that God was ordering him to do things, played a large part in the killing and the 1975 incident, the trial court thought it appropriate that these beliefs be explored. This was particularly necessary because of evidence that defendant had recently increased his purchase of religious books and pamphlets, and spent a portion of each day reading the Bible.
 

 The court therefore denied the second application for outpatient status. In determining whether that decision was an abuse of discretion, we are
 
 *630
 
 concerned with the fact that the prosecution did not present any affirmative expert testimony that defendant is dangerous. Such evidence, even if contradicted by a number of other doctors, would support a denial of outpatient status.
 
 (People
 
 v.
 
 Henderson, supra,
 
 187 Cal.App.3d 1263, 1269.)
 

 Is it an abuse of discretion to deny outpatient status without any current expert testimony supporting the conclusion that defendant is dangerous? In our view it is not, because the trial court is entitled to consider the validity of the opinions presented to it in determining whether defendant met his burden of proving that he was not dangerous.
 
 [10]
 
 Having failed to convince the trial court that the opinions were valid, defendant failed to carry his burden of persuasion.
 

 The reasons stated by the trial court were legitimate concerns resulting from a thorough review of the testimony and documentary evidence. For example, the experts agreed that defendant has a mental illness which is controlled by medication. They did not know, or did not consider, what would happen if defendant did not take his medication while on outpatient status. (Cf.
 
 People
 
 v.
 
 Bolden
 
 (1990) 217 Cal.App.3d 1591, 1602 [266 Cal.Rptr. 724] [defendant has burden, in a section 1026.5 proceeding, of showing that his medicine is effective in controlling his behavior and that he will take his medicine in an unsupervised environment];
 
 People
 
 v.
 
 Williams
 
 (1988) 198 Cal.App.3d 1476 [244 Cal.Rptr. 429] [in a restoration of sanity hearing, defendant was entitled to an instruction that the jury could consider his medicated condition in deciding if he was dangerous].) In effect, the trial court placed on defendant the burden of showing that he would take his medication while an outpatient and found that defendant had failed to meet that burden.
 

 The court also considered such practical issues as the amount of stress defendant could be subjected to on outpatient status. It noted that defendant’s relationship with his wife was unresolved, and that it could be expected to cause stress that could be a precursor to a bizarre episode. It also questioned the amount of supervision defendant would receive on outpatient status, particularly on weekends. Thus, the trial court postulated a situation in which defendant argued with his wife on Friday night, began drinking, and then committed a crime before returning to supervision on Monday morning.
 

 In addition, the trial court considered the religious issue, discussed below. None of these concerns of the trial court were arbitrary or unrealistic. They
 
 *631
 
 were each based on the idea that the outpatient treatment program, as testified to by Mr. Daniels, would not sufficiently control defendant to assure society that defendant would not be a danger to others. Since the statute requires the community program director to identify an appropriate plan of supervision and treatment (§§ 1602, subd. (a)(2), 1603, subds. (a)(2) & (c)), the trial court apparently concluded that the treatment plan described by Mr. Daniels was inadequate because it did not meet the statutory requirements. This reason was found to be sufficient in the
 
 Henderson
 
 case, and we find it sufficient here.
 
 (People
 
 v.
 
 Henderson, supra,
 
 187 Cal.App.3d 1263, 1269-1270.)
 

 We therefore find that the trial court did not abuse its discretion in denying defendant outpatient status at the end of either hearing.
 

 The Religion Issue
 

 Defendant also contends that the trial court improperly infringed on defendant’s freedom of religion by considering defendant’s religious beliefs as a basis for denial of outpatient status. He argues that the trial court improperly expected expert analysis of defendant’s religious beliefs in order to determine if he was dangerous.
 

 Defendant points out that persons with mental illness have a right to religious freedom, and the state cannot burden or abridge that right without showing a compelling interest in doing so. (Welf. & Inst. Code, § 5325.1, subd. (e);
 
 In re Arias
 
 (1986) 42 Cal.3d 667, 692 [230 Cal.Rptr. 505, 725 P.2d 664].) He argues that the prosecutor and the trial court here, in questioning witnesses about defendant’s religious beliefs, had the burden of proving that defendant’s religious beliefs while in a nonpsychotic state made him dangerous, or that his actual beliefs are likely to trigger a psychotic episode. He also argues that the prosecution failed to prove that defendant’s religious beliefs would lead to a psychotic episode, or that his religious behavior indicated dangerousness.
 

 We disagree. The prosecution and the trial court were aware of, and distinguished between, genuinely held religious beliefs and command delusions which caused the defendant to act in the belief that God was commanding him to kill the victim. The crime here followed a period of religious intensity in defendant, and the trial court was concerned that defendant’s continuing religious beliefs, and their recent intensification, could be indicative of future dangerousness.
 

 As the trial court stated, “[U]ntil [the experts] deal with what exactly is Mr. Sword’s religious belief and how strongly he feels and what that religion
 
 *632
 
 tells him he can and cannot do in the sense of what is moral, that is a big gap. [¶] . . . [I]f Mr. Sword ascribes to a religion that says it’s okay to kill infidels, and that is moral to do, in my view that person would pose more of a threat if they are released than a person who does not have those kind of feelings. And it’s important to explore that with him, which they have not done.”
 

 The trial court thus faulted the experts who testified for not exploring the linkage between defendant’s religious beliefs and his actions. Shortly after the killing, a doctor stated: “He continues to suffer from psychotic thinking of a religious nature. Despite his taking medication, it is likely that his present and future behavior will be determined by the excessive and psychotic religiosity in his thought processes, and these have clearly proven to be dangerous to the health and safety of others.” The prosecution and the trial court were attempting to find out whether defendant’s continuing preoccupation with religion was indicative of continuing psychotic behavior or not. The experts who testified at trial had not focused on this issue despite the fact that defendant killed the victim after discussing the Islamic religion with him, and after believing he had received a command from God to kill the victim.
 

 Defendant finds no linkage, arguing that the important factor is that defendant does not show signs of psychosis. Defendant argues that his religious beliefs are irrelevant, and the only question is whether he shows a psychosis or not.
 

 We disagree because excessive religiosity is a manifestation of defendant’s psychosis. We therefore find at least a possible linkage between overt manifestations of religiosity and the existence or strength of the psychosis. As respondent points out, Dr. Kania testified that defendant’s excessive religiosity was a symptom of his mental illness because it was of delusional proportions. Dr. Reed testified that defendant becomes psychotic and possibly dangerous when he hears voices. Dr. Kasper testified that if defendant became sick his delusion would be religious in content. Mr. Daniels agreed that it would be of some interest to know the current status of defendant’s religious beliefs and why defendant was reading the Bible, but he had no knowledge on those subjects.
 

 In short, the trial court and the prosecution found that defendant’s religion was relevant because religion, in the form of psychotic delusions, had played an important role in the crime. The trial court thought that the experts should have inquired into defendant’s religious beliefs to determine if they were still indicative of continuing dangerousness. In view of the circumstances of the crime, we find this to be a legitimate concern. Thus, if there was any
 
 *633
 
 conceivable burden on defendant’s religious beliefs, or invasion of his privacy, from an inquiry as to what those beliefs are, a compelling state interest, to assure that a dangerous person was not released into the community, justified the inquiry. We find no abridgement of defendant’s religious freedom.
 

 Right to Hearing Before an Impartial Judge
 

 Defendant next contends that he was deprived of his right to a hearing before an impartial judge because the trial court was predisposed to deny the recommendation for outpatient status. He cites several examples that he characterizes as extensive and improper examination by the trial court. Defendant also cites cases such as
 
 People
 
 v.
 
 Rigney
 
 (1961) 55 Cal.2d 236 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186], in which the trial court’s comments and examination of witnesses could have improperly influenced a jury.
 

 No such considerations were present here. There was no jury, and the proceedings were less formal than a criminal trial.
 
 [11]
 
 Even in a criminal trial, examination of witnesses by the court is generally proper.
 
 (People
 
 v.
 
 Camacho
 
 (1993) 19 Cal.App.4th 1737, 1744-1746 [24 Cal.Rptr.2d 286].)
 

 We have reviewed the entire record, including the portions cited by defendant, and find no abuse of the trial court’s discretion. The record indicates that the trial court was attempting to obtain the information it needed to decide whether to accept the recommendations of the expert witnesses. The less formal remarks of the trial court are not indicative of prejudice.
 

 We therefore find no merit to defendant’s contention that the trial court was partial or unfair.
 

 Use of Hospital Records
 

 Defendant also contends that the trial court erred in admitting his entire hospital record into evidence. He argues that the records are inadmissible hearsay not admissible under the business records exception to the hearsay rule.
 

 
 *634
 
 At the beginning of the hearing, the trial court stated that the procedures in the hearing allowed the use of reliable hearsay because section 1026, subdivision (c), refers to the procedures used in probation revocation proceedings under section 1203.2. Documentary hearsay evidence is admissible in such hearings if the court decides that it is reliable.
 
 (People
 
 v.
 
 Maki
 
 (1985) 39 Cal.3d 707, 709 [217 Cal.Rptr. 676, 704 P.2d 743].) After deciding that the records were admissible, the trial court allowed the prosecutor to go through the records and argue from them as part of its case-in-chief.
 
 [12]
 

 Defendant made his hearsay objection in reference to use of the handwritten notes from the Patton staff.
 
 [13]
 
 From the description in the record and examination of the exhibit, it appears that the defense was objecting to introduction of handwritten notes on forms entitled, “Interdisciplinary Notes,” “Psychology Progress Notes,” and “Social Work Progress Notes.” These forms record observations of defendant, conversations with defendant, and primarily factual data, such as medication taken. Defendant’s hearsay objection was overruled on grounds that the notes were admissible as business records under Evidence Code sections 1560 and 1561, and admissible in any event in a section 1203.2 proceeding.
 

 Defendant attacks this ruling and argues that the notes were hearsay that was not admissible under the business records exception to the hearsay rule. He relies on
 
 People
 
 v.
 
 Young
 
 (1987) 189 Cal.App.3d 891 [234 Cal.Rptr. 819] and
 
 People
 
 v.
 
 Reyes
 
 (1974) 12 Cal.3d 486 [116 Cal.Rptr. 217, 526 P.2d 225].
 

 Young
 
 is a criminal case in which the psychiatric records of defendant were not admitted during the sanity phase of the trial. The court found no error, saying “[w]e have examined the records and note that they contain numerous conclusions and entries of unknown source or reliability. While doctors from each of the three treatment centers did testify, appellant did not examine them as to the source and preparation of the psychiatric records. The court did not err in finding a lack of foundation. [][] For similar reasons, the court also properly sustained a hearsay objection to introduction of the records.”
 
 (People
 
 v.
 
 Young, supra,
 
 189 Cal.App.3d 891, 911.) The court also found that none of the four foundational requirements for introduction of the records as business records had been met. (Evid. Code, §§ 1562, 1271.) In addition, the court also questioned whether psychiatric records, which tend to be opinions, qualify as business records at all.
 
 (Young, supra,
 
 at p. 912.)
 

 
 *635
 
 In
 
 People
 
 v.
 
 Reyes, supra,
 
 12 Cal.3d 486, our Supreme Court held that it was not error to refuse to admit the victim’s psychiatric records from 20 years earlier. The court found that a diagnosis in a report in those records did not meet the requirements of Evidence Code section 1271 that the record be “ ‘of an act, condition or event.’ ” (12 Cal.3d at p. 503.)
 

 Even if we assume that defendant is correct in his assertion that the records were hearsay, and that the business records exception is inapplicable, we find the records admissible under the state of mind exception to the hearsay rule. The issue in the case was whether defendant should be placed on outpatient status. Outpatient status is appropriate only if the court finds that defendant will not be a danger to the health and safety of others while on outpatient status. To make this finding, the court must necessarily inquire into defendant’s present state of mind, and that state of mind is the deciding issue in the case. When state of mind is in issue in the action, evidence of a statement of the declarant is admissible to prove declarant’s state of mind. (Evid. Code, § 1250.) By placing his mental state in issue in the outpatient status hearing, defendant essentially waived any hearsay objection to evidence concerning his state of mind. Thus, insofar as the challenged records noted conversations with defendant, or statements defendant made to others, they were admissible under the state of mind exception to the hearsay rule.
 

 Insofar as the challenged records noted conversations with other persons, we agree with the trial court that they were still admissible because reliable hearsay evidence may properly be considered in outpatient status hearings, just as it is in parole revocation proceedings.
 

 “ ‘[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations.’ [Citation.] Despite the relaxed rules of evidence governing probation revocation proceedings, a court is not permitted ‘ “to admit unsubstantiated or unreliable evidence as substantive evidence ....”’ [Citations.] [¶] As long as hearsay testimony bears a substantial degree of trustworthiness it may legitimately be used at a probation revocation proceeding. [Citations.] In general, the court will find hearsay evidence trustworthy when there are sufficient ‘indicia of reliability.’ [Citation.] Such a determination rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.”
 
 (People
 
 v.
 
 Brown
 
 (1989) 215 Cal.App.3d 452, 454-455 [263 Cal.Rptr. 39].)
 

 An outpatient status hearing, like a probation or parole revocation proceeding, is not a criminal proceeding. Issues which relate to the questions of whether defendant continues to have a mental illness, and whether defendant
 
 *636
 
 continues to be dangerous, can only be fully explored if the trial court is presented with defendant’s complete medical records. Even if such records were not technically within the business records exception or state of mind exceptions to the hearsay rule, they are usable at an outpatient status hearing if the trial court finds that they are reliable. Here, the notes of the Patton Hospital staff were reliable because they were contemporaneous records kept by the staff in the regular performance of their duties. They were usable to show that defendant’s witnesses were unaware of certain events occurring during defendant’s treatment at Patton Hospital.
 

 Under the outpatient status procedure, the state hospital and the community program director must submit to the court an evaluation and recommendation for the treatment of the defendant on outpatient status, and the trial court must evaluate the recommendation in order to approve or disapprove it. (§§ 1602, 1604.) In order to carry out its function, we think the trial court must have available any and all reliable information that the hospital possesses relating to the patient. While some of the material is hearsay, the trial court’s use of the notes to evaluate the recommendation given to it is necessary and proper, just as it is in a probation or parole revocation hearing.
 

 We therefore conclude that the trial court did not err in allowing the introduction of defendant’s complete hospital file into evidence.
 

 Disposition
 

 The orders denying outpatient status are affirmed.
 

 Dabney, Acting P. J., and Bigelow, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was denied November 2, 1994, and appellant’s petition for review by the Supreme Court was denied January 25, 1995.
 

 [1]
 

 Unless otherwise indicated, all further statutory references are to the Penal Code.
 

 [2]
 

 Orders denying outpatient status are appealable under section 1237, subdivision (b) (orders after judgment affecting the substantial rights of a party).
 
 (People
 
 v.
 
 Coleman
 
 (1978) 86 Cal.App.3d 746, 750 [150 Cal.Rptr. 415].) Review is under an abuse of discretion standard.
 
 (People
 
 v.
 
 Henderson
 
 (1986) 187 Cal.App.3d 1263, 1267-1268 [233 Cal.Rptr. 141].)
 

 [3]
 

 The facts are taken from the preliminary hearing and are undisputed.
 

 [4]
 

 A revised version of section 1026.2, effective January 1, 1995, does not require participation in the outpatient program as a prerequisite for restoration of sanity proceedings. (Stats. 1993, ch. 1141, § 1.)
 

 [5]
 

 “Of course, a defendant who recovers his sanity need not remain confined for the maximum term. Release is possible at any time following a mandatory, 180-day commitment period (§ 1026.2, subd. (d)) if the defendant demonstrates his fitness for release, first by successfully completing one year under supervision in a community mental health program and then in a sanity-restoration trial. (§ 1026.2, subd. (e).)”
 
 (People
 
 v.
 
 Tilbury, supra,
 
 54 Cal.3d 56, 63].)
 

 [6]
 

 Actually, it was his mental illness that arguably eliminated premeditation and deliberation and reduced the murder from first degree to second degree. Without the mental illness, the murder would have been first degree, thus carrying a sentence of 25 years to life.
 

 [7]
 

 Defendant requested that this court take judicial notice of a jury instruction proposed by a defendant in an unrelated restoration of sanity proceeding in San Bernardino Superior Court. That instruction places the burden of proof on the People, despite section 1026.2, subdivision (k). Finding the instruction to be irrelevant, we deny the request to take judicial notice.
 

 [8]
 

 This coincides with the experience of the program, which has only a 15 percent failure rate.
 

 [9]
 

 According to the prosecution, the Patton notes reflected a 1975 episode in which defendant was arrested at John Wayne Airport. He had gone to the airport because of command hallucinations in which God told him to travel. Defendant subsequently barricaded himself in his house and held members of his family hostage. At the preliminary hearing, defendant’s wife testified to these incidents, which included command hallucinations.
 

 Dr. Moral also reported the barricading incident in 1975. According to Dr. Faerstein, there were episodes of command hallucinations in 1974 and 1975.
 

 Dr. Kasper testified that he was aware of an episode in 1975, but was unaware of any command hallucinations at that time. Dr. Kasper was apparently referring to the barricading incident as he did not remember the airport episode. Dr. Kasper also testified that the original diagnosis of defendant, which referred to a single episode of depression, was wrong because of the earlier incident in 1975.
 

 [10]
 

 There were, of course, old expert opinions that defendant was dangerous. In effect, the trial court found these opinions outweighed the more recent opinions of the experts who testified that defendant was no longer dangerous.
 

 [11]
 

 In hearings under section 1026.2, subdivision (c), the procedure used in conducting probation revocation proceedings under section 1203.2 applies. Section 1203.2 does not require adherence to the formal rules of criminal trials.
 
 (People
 
 v.
 
 Sweeden
 
 (1953) 116 Cal.App.2d 891, 893-894 [254 P.2d 899].) Accordingly, even extensive questioning by the trial court does not mean that the trial court is not impartial.
 
 (People
 
 v.
 
 Buford
 
 (1974) 42 Cal.App.3d 975, 983 [117 Cal.Rptr. 333].)
 

 [12]
 

 This informal procedure is not recommended. Since defendant had the burden of proof, he should have gone first, and the prosecution could then use the medical reports to cross-examine the defense witnesses. A more formal procedure was followed in the second hearing.
 

 [13]
 

 Respondent contends that defendant’s failure to object to the introduction of the doctor’s reports is a waiver of defendant’s present argument. (Evid. Code, § 353, subd. (a).) However defendant did object to the introduction of the staff notes on hearsay grounds. We find this objection to be sufficient and proceed to discuss the merits of defendant’s contention.
 

 *
 

 Retired judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.