Filed 6/30/14  P. v. Mitchell CA4/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>LAMAR V. MITCHELL,<br><br>          Defendant and Appellant. | A137791<br><br>(Alameda County<br>Super. Ct. No. C144612) |

Lamar V. Mitchell appeals from an order denying his request for conditional release for outpatient treatment pursuant to Penal Code,[1] section 1603.  He contends that the trial court abused its discretion in denying his request because his treatment providers unanimously agreed that he was suitable for outpatient status.  We affirm.

## I.  FACTUAL BACKGROUND

On December 11, 2003, the court found defendant not guilty by reason of insanity (§ 1026) of second degree murder.  The offense occurred on June 26, 2002, when defendant attacked Roysel Marshall-Darrow, and fatally stabbed him with a knife.  Defendant had not previously met Marshall-Darrow.  On January 22, 2004, the court ordered defendant committed to the Napa State Hospital for a term of life.

On November 15, 2012, the Napa State Hospital notified the court that defendant was no longer a danger to the health and safety of others and recommended that he be released for outpatient treatment under the Alameda County Conditional Release

---

[1] All further statutory references are to the Penal Code.

1

Program (CONREP) pursuant to sections 1603 and 1604. The court held a hearing pursuant to section 1604, subdivision (c) on January 18 and 25, 2013. The following evidence was presented.

### 1. *Dr. Eytam Bercovitch*

Dr. Eytam Bercovitch, a staff psychologist at Napa State Hospital, testified as an expert in risk assessment and readiness for conditional release. For the past four years, Bercovitch had been a part of defendant's treatment team and generally saw him on a daily basis. He met with defendant in individual meetings, group therapy, treatment planning conferences, and team meetings with defendant's psychiatrist, social worker, and the treating therapist.

Bercovitch testified that defendant first began having symptoms when he was about 15 years old and was first hospitalized at age 17. He was diagnosed as having paranoid schizophrenia and prescribed antipsychotic medication. He was treated on an outpatient basis, but he was involuntarily committed several times including after a suicide attempt.

In the month prior to committing the murder, defendant had stopped taking his medications because he became convinced that he was no longer mentally ill. In a visit to his treatment providers, eight days prior to the murder, he told the staff that things were going well for him and that all he needed was to renew his medication prescriptions. After the murder, defendant reported that he had been experiencing increased psychotic symptoms in the period prior to the murder, and he heard voices telling him he was in danger and had to defend himself.

In October 2012, defendant's team concluded that he was ready to leave Napa State Hospital. CONREP also evaluated defendant and determined that he was ready to be released to their program.

Bercovitch along with defendant's psychiatrist, Dr. Margaret Miller, prepared the report recommending defendant for CONREP (the Bercovitch report). He found

2

defendant to have an Axis I[2] diagnosis of schizophrenia of the paranoid type and an anxiety disorder. Defendant's symptoms included auditory and visual hallucinations and delusions. Bercovitch opined that defendant was now in remission. He experiences milder symptoms but is fully compliant with treatment. Bercovitch stated that "even with the best medication and treatment, someone who has schizophrenia may still have occasional symptoms. For instance, they may still have some auditory hallucinations, voices, but . . . they don't necessarily have to act on them or see them as anything but symptoms."

Defendant's anxiety disorder manifests in panic attacks which include auditory and visual hallucinations. These symptoms have been decreasing and the episodes occur less frequently and are milder.

Bercovitch opined that defendant would not be a danger if released with supervision in CONREP. He further opined that defendant no longer needs a restrictive setting and would benefit from a less restrictive environment. Bercovitch acknowledged, however, that defendant has slower cognitive functioning and that if he were to experience residual delusions, he would need to report them to his CONREP team. Factors that might contribute to a relapse by defendant include failing to take his medication, stressful situations, and failing to eat or sleep.

### 2. Helene Hoenig

Helene Hoenig, a licensed clinical social worker for CONREP, provides clinical case management. She has met with defendant about every six months since June 2008 to assess his progress at the hospital and his perceived need for treatment. She prepared a report recommending that defendant be ordered into community outpatient treatment.

Hoenig would be defendant's outpatient supervisor if he were released into the community under CONREP. CONREP would have the authority to rehospitalize defendant if it had any concern that he would reoffend or if his symptoms escalated.

---

[2] Axis I signifies a severe clinical diagnosis as opposed to Axis II which designates personality disorders.

CONREP's treatment plan includes a 90-day stay at a transitional residential program which involves 24-hour supervision. It is a restrictive program which includes group sessions in relapse prevention, substance management, substance abuse, individual counseling, and toxicology and substance abuse testing. Upon progressing in the program, defendant would be permitted to leave the premises with staff and eventually be allowed visitors. Staff would be responsible for administering and monitoring his medication.

If defendant were successful during the 90-day transitional program, he would be transferred to a group home where he would receive an intensive level of care with the highest level of supervision. Defendant's medications would be monitored and he would participate in group therapy twice a week and be seen by a social worker and other therapists. A psychiatrist would meet with him within a week from his discharge from the transitional program.

Hoenig opined that defendant could be safely and effectively treated in CONREP, and that he would benefit from the services. Defendant is stable, his symptoms are mild and manageable, and he is taking his medication. Hoenig acknowledged that a transfer to outpatient treatment would be a big transition for defendant and that this could be a stressor for him. Defendant would be at risk for decompensation if he discontinued his medication. Other risk factors would include changes in sleep patterns and substance abuse.

While CONREP prefers to work with group homes that are licensed to administer medication directly to residents, some of the homes with which it works do not have that authority. These latter homes, however, do monitor the taking of medication, requiring the resident to take the medication in front of staff. The decision on whether to use a licensed or unlicensed home is dependent upon availability and CONREP's determination as to which home is the most appropriate for the client.

In a group home, defendant would have a curfew, but would be free to leave during the day. He would leave the home for CONREP groups and medical, psychiatric,

4

and therapy appointments.  Initially, however, CONREP would restrict his mobility until he learned his way around the community.

### 3. *Dr. Margaret Leftwich Miller*

Dr. Margaret Leftwich Miller is a staff psychiatrist at Napa State Hospital.  She signed the Bercovitch report agreeing with the recommendation that defendant be released into CONREP.

Miller is defendant's psychiatrist at the hospital and she has known him since the fall of 2008.  She usually meets with him individually once a month to review his treatment and with defendant's team on a quarterly basis to assess his progress.  Defendant is currently taking Clozaril and Risperdal to treat his schizophrenia.  He also takes Zoloft, an antidepressant, BuSpar to treat his anxiety, and Propranolol to treat both a heart tachycardia and anxiety.  Clozaril and Risperdal have reduced defendant's auditory hallucinations and his isolation.  He understands that the auditory hallucinations are part of his mental illness and is "able to step out and observe it before it's so overwhelming."

Miller opined that defendant would not be a danger to himself or others while under supervision in the community.  She acknowledged that if defendant were under a lot of stress, it could exacerbate his symptoms, and that the transition into the community could be very stressful.  Miller would be very concerned if defendant missed a single dose of his Clozaril medication, because it could result in defendant becoming symptomatic.  He currently takes Clozaril three times daily, in conjunction with his other medications.  Miller hoped that defendant would have some assistance with his medication because if he was on his own, it would be very difficult at least for the first few months.  In addition, the medication can be sedating, so Miller opined that defendant would need someone to help him get up in the morning to ensure he took his medication.  A blood test could detect if defendant was not taking the Clozaril medication after three or four days.

5

### 4. *The trial court's ruling*

The trial court denied defendant's request, reasoning that defendant had only begun to show "some level of improvement" in the past year. In addition, the court was concerned that defendant's history showed that he has been on both inpatient and outpatient treatment since his diagnosis and that it has only been the structure of the hospital that has helped him address his mental health issues. Given that defendant was on numerous medications that were required to be taken at different times to maintain his serious mental health issues under control, the court noted that defendant would need assistance with his medication and it was unclear whether a group home would ensure he receives his medication. In light of the fact that Dr. Miller testified that a missed single dosage of defendant's medication could result in a recurrence of his symptoms, the court was concerned that defendant posed a danger to the public. Finally, the court acknowledged that defendant was a smart person who might, despite symptoms, say what the treatment staff wants to hear.[3] The court opined, however, that if defendant continued with his progress, he would at some point be able to be released to CONREP.

## II. DISCUSSION

Section 1026 provides that the court may commit a defendant who is found insane at the time of the commission of an offense to a state hospital or certain public or private treatment facilities or the court may order the defendant placed on outpatient status pursuant to section 1600 et seq. (§ 1026, subd. (a).) "A person may be released from a state hospital (1) upon restoration of sanity pursuant to the provisions of section 1026.2, (2) upon expiration of the maximum term of commitment under section 1026.5 [citation], or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1.)" (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 [*Sword*].) In order to be released on outpatient status, the director of the state hospital and the community program director must make a recommendation that the defendant is suitable for release,

---

[3] Defendant had misled his treatment providers prior to the underlying offense, telling them that he was doing fine despite experiencing increased psychotic symptoms.

and the court must approve the recommendation after a hearing. (*Ibid*.) " 'Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' " (*Ibid*., quoting *People v. Wymer* (1987) 192 Cal.App.3d 508, 513.)

A defendant seeking to be released on outpatient treatment following an insanity commitment has the burden of proving by a preponderance of the evidence that he or she is no longer mentally ill or not dangerous. (*People v. Cross* (2005) 127 Cal.App.4th 63, 72; *People v. Sword*, *supra*, 29 Cal.App.4th at p. 624.) We review the court's decision on defendant's request for release to outpatient treatment for abuse of discretion. (*Cross, supra,* at p. 73; *Sword, supra,* at pp. 624–625.)

Defendant contends that the trial court abused its discretion in denying his request for outpatient treatment pursuant to section 1600 et seq. because it disagreed with the unanimous opinion of defendant's treatment providers. We conclude that the trial court had legitimate reasons for denying defendant's request.

The court, in denying defendant's request, remarked that it was concerned that defendant had shown only recent improvement in managing his mental illness during the past year. While it is true, as defendant argues, that he had no significant behavioral problems since his admission to Napa State Hospital, the record also shows that it was only within the past year that Dr. Miller had determined the proper dosages of medication to manage the symptoms of defendant's schizophrenia and anxiety. The Bercovitch report reflects that in December 2011, defendant's team determined that defendant was not ready for outpatient treatment, because he continued to exhibit active symptoms of his mental illness. The team thus worked to decrease his symptoms by adjusting his medication and helping him improve his coping and organizational skills. Hence, it was not until defendant's medications were adjusted in 2012, and he engaged in more specialized individual therapy that the frequency of his episodes of auditory hallucinations and anxiety decreased. Indeed, Hoenig's July 6, 2012 report noted that

7

defendant had "met all CONREP recommendation[s] with the exception of an 'ongoing' process of reducing his auditory hallucinations and refining his understanding of the factors involved in his instant offense." Although the team agreed that he had met the goal of being able to manage his symptoms, the Bercovitch report, dated November 15, 2012, suggests that this had occurred only in the period since July 6, 2012. Accordingly, at the time of the January 18 and 25, 2013 hearing on defendant's outpatient request, defendant had not been adept at managing his symptoms for a significant period of time.

Moreover, the court was also concerned about defendant's need for assistance and management of his medications. Dr. Miller's testimony was particularly salient on this point—if defendant missed just a single dose of his medication, she would be concerned, as he could become symptomatic. Dr. Miller also stressed that she hoped defendant would have assistance with his medication, but Hoenig testified that it was possible that after 90 days, defendant could be released to an unlicensed group home that could not administer defendant's medications. And the court was cognizant of the fact that defendant had committed the underlying offense when he had ceased to take his medication. Finally, the court was concerned that defendant might mislead his treatment providers even if he was experiencing symptoms. In short, the trial court did not abuse its discretion in finding that defendant failed to prove by a preponderance of the evidence that he did not present a danger to the community.

"The release decision is not solely a medical or expert decision. The court's role is to apply a community standard to the release decision: 'In a democratic society, we believe, the function of delimiting dangerousness *for release purposes* belongs to the community. Translating community values and policies into an operational definition of dangerousness has been assigned initially to legislators and then to judges as construers of legislative determinations and not to any particular administrative or professional group including psychiatrists.' [Citation.] Accordingly, the judge's role is not to rubber-stamp the recommendations of the [hospital's] doctors and the community release program staff experts. Those recommendations are only prerequisites for obtaining a hearing. (§ 1602.) The fact that the statute requires the trial court to approve or

8

disapprove the expert's recommendations shows the discretion placed in the trial court. (§ 1604, subd. (d).)" (*Sword, supra*, 29 Cal.App.4th at p. 628.)

Here, while the consensus of defendant's treatment team was that he was ready for outpatient status, the record, as a whole, supports a finding that defendant had not yet shown that he could be released to outpatient status without posing a danger to the community. The trial court did not abuse its discretion in denying defendant's request for conditional release to CONREP.

### III. DISPOSITION

The order denying defendant's request for outpatient status is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.