Filed 2/20/14  P. v. Arroyo CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Placer)

----

| | |
|---|---|
| THE PEOPLE, | C073089 |
| Plaintiff and Respondent, | (Super. Ct. No. SCR1725) |
| v. | |
| SHANE CARLOS ARROYO, | |
| Defendant and Appellant. | |

Defendant Shane Carlos Arroyo appeals from the trial court's orders extending his not guilty by reason of insanity (NGI) commitment to June 27, 2014, and denying his petition for transfer to outpatient treatment.  He contends insufficient evidence supports the orders.  We will affirm both orders.

1

## FACTUAL BACKGROUND

In 1995, defendant was found NGI of burglary and attempted vehicle theft.  He was first committed to Atascadero State Hospital.  Two years later, defendant was transferred to Napa State Hospital (hereafter NSH).

On January 25, 2012, a petition to extend defendant's commitment was filed pursuant to the October 2011 written report of NSH's acting medical director.  The report requested an extension of defendant's commitment based on his severe mental illness (schizoaffective disorder, bipolar type) which caused him to represent a substantial danger to others.  The report reflected that defendant's psychiatric symptoms were not in complete remission and he remained suspicious, had limited insight into his mental illness, and needed to develop a better understanding of how paranoia caused him to exhibit dangerous behavior.  The report described the 1995 offenses.  Defendant broke into an occupied home and when the resident confronted defendant, he said he believed in God.  He then walked into the garage where the police found him.  He claimed he did not have a name and was restoring the car to its original condition.  The report noted that in 2000, defendant entered the outpatient conditional release program (CONREP).  Outpatient treatment was revoked in 2009 when defendant "decompensat[ed]" and sent a threatening letter to the president of the Latter Day Saints (Mormon Church) in Salt Lake City, Utah.  Defendant was recommitted to NSH and had remained there since 2009.  Defendant is a member of the Mormon Church.  He believed that the church was out to destroy him and he would " 'harm them before they harm him.' "

On April 23, 2012, defendant filed a request for transfer to outpatient treatment.  In his October 2012 written opinion, staff psychiatrist Harinder Auluck, M.D., of NSH recommended that defendant be placed in CONREP.

At the January 2013 bench trial, the prosecution called two witnesses, Laurie Rubel, defendant's CONREP social worker, and Dr. Auluck. Rubel testified as follows about defendant's comments and behavior.

In 2005, defendant stated that the "Columbine High School killers were not right, but their actions were justified." Defendant believed that CONREP and the Mormon Church had conspired to deny his rights. Defendant stated that he wanted those conspiring against him " 'to experience the pain that [he had] experienced.' " Defendant claimed a Mormon bishop told him that he was scaring younger women in the congregation and the bishop did not want defendant talking to them.

In 2006, defendant told Rubel that he "enjoyed making provocative statements to others so they would respect and fear him." Defendant claimed church elders were " 'trying to silence [him] and take away [his] rights.' " A church elder also told defendant that he scared people and to stay away from young women. Defendant stated that he felt "abused by his church, by law enforcement, and by all of America" and wanted "to get vengeance on 'all those who want to be gods over [him] and take away [his] rights.' " At work on one occasion, he screamed disturbing and threatening comments, which he did not self-report to CONREP. Defendant told a woman that the " 'Columbine killers were the patron saints of high school students.' " Defendant told Rubel that " 'People should get their just deserves by burning in hell.' " He stated that he felt powerful when he was angry. Later, defendant reiterated that he enjoyed being angry and wished " 'vengeance against [his] enemies.' " Defendant worked at the Salvation Army and felt persecuted by the women who worked there. In 2006, defendant also had financial problems and was unable to maintain a clean living area.

In 2007, defendant described himself as having " 'superior, prophet-like' " and " 'God-like qualities' " and abilities. While on CONREP, defendant was for the most part medication compliant. However, there were times when defendant had not been

3

medication compliant, which he reported after the fact; he had forgotten to get or take prescriptions. During a therapy session, when defendant was confronted for laughing inappropriately at something that was sad, defendant got angry and asked the therapist if she would like it if defendant " 'sent a bunch of pyromaniac arsonists to [the therapist's] neighborhood.' " In a group session, defendant stated that he understood how the Virginia Tech shooter felt, alienated and alone. Defendant made comments about the Virginia Tech shooting to a Salvation Army customer who called the police. As a result, CONREP increased the level of defendant's supervision to every day. In another group session, defendant stated that he wanted to " 'go after people at the church who are always telling [him] to stay away from women.' " Defendant claimed the church was oppressing him. Defendant wanted the women who rejected him to be punished. Defendant became inordinately angry or upset when a woman rejected his invitation to have a cup of coffee. At one point, defendant stated that he did not know how he could function without CONREP.

In May of 2008, defendant's behavior improved and, as a result, his medications were adjusted at his request. Four months later, he felt persecuted by old high school classmates and started sending angry, accusatory online messages. His antipsychotic medications were increased. A couple of months later, defendant entered a local store and told the owner that he " 'Felt like a failed savior.' " The owner called the police. CONREP supervision increased. Defendant's finances became chaotic and there was another change in medications.

In 2009, a female high school classmate rejected defendant when he called her and rejected him again when he called the next day. Defendant claimed his loneliness causes him to act " 'crazy.' " Defendant had a heated telephone conversation with a Mormon elder in defendant's church. Defendant later visited a Mormon thrift shop and told the supervisor that defendant " 'forgives the enemies of [his] enemies.' " Defendant then

wrote the threatening letter to the president of the Mormon Church. His letter referred to a "semi-tanker full of whooping." Rubel would have felt "very threatened" if she had received the letter.

Rubel was willing to accept defendant back into CONREP *provided* that he developed a written plan for dealing with church members. To Rubel's knowledge, defendant had not done so.

The 37-year-old defendant was first diagnosed with schizophrenia when he was 13 or 14 years of age. Dr. Auluck testified that defendant's symptoms were under control with medication and therapy at NSH. Defendant, who suffers from schizoaffective disorder of the bipolar type, was prescribed high dosages of psychiatric medications to keep his symptoms in remission. The hospital monitored the effects of the medications through blood work. The hospital also monitored defendant's other medical issues including hyperthyroidism which, if not properly regulated, could result in symptoms of mood disorder. Even while taking all his medications, defendant still had a bit of grandiosity and some paranoia that he has been mistreated. If lower dosages were prescribed, Dr. Auluck believed defendant's symptoms would worsen. And if defendant stopped taking his medications, he would decompensate in one to two weeks and become angry, impulsive, more abrasive, and even threatening.

Dr. Auluck opined that defendant posed a substantial danger of physical harm to others having considered defendant's entire mental health history contained in the hospital records as well as defendant's 1995 commitment offenses. Dr. Auluck testified that Rubel's testimony provided additional details that supported his opinion as did defendant's letter to the president of the Mormon Church. Even after nine years of CONREP supervision, defendant became psychotic. While at NSH, defendant had not engaged in acts of physical aggression but had had some difficulty with peers; with the assistance of staff, defendant was able to resolve the issue. Defendant had recently stated

that he had the " 'capacity for being dangerous, but the consequences ke[pt] [him] from being violent.' " Risk factors for violence included: (1) defendant's mental illness history, which included psychotic symptoms of paranoia, persecutory delusions, and threat of retaliation; (2) stressors, which included his interpersonal and family relationships; (3) his act of breaking into a stranger's occupied home; and (4) his threatening letter to the president of the Mormon Church.

Dr. Auluck was concerned about defendant's plan to seek services from local mental health providers if released without supervision because services in the area were very limited and at times difficult to obtain. Defendant had not been in the community without supervision since 1995.

When asked whether defendant had serious difficulty controlling his dangerous behavior, Dr. Auluck testified that defendant had been very impulsive in the past and, without supervision, that impulsivity may return. Even though controlled with medications, defendant still believed the Mormon Church treated him poorly and he still had some grandiosity. Dr. Auluck believed defendant may become anxious under stress and that, without supervision, he would not be reminded to take his medications without which his symptoms would not be controlled.

Dr. Auluck agreed that defendant, who was not actively or acutely psychotic, could be released to outpatient treatment under CONREP supervision. Defendant knew he had been diagnosed with a mental illness and knew he needed treatment and medication so his symptoms of paranoia and delusional thinking did not recur and he would " 'possibly become dangerous again.' " Dr. Auluck believed that it would be impossible for defendant to stay away from the church because the social life of the organization was what defendant wanted most of the time. Without CONREP supervision, Dr. Auluck opined that defendant would be a substantial danger of physical harm to others.

6

For the defense, NSH staff psychologist Melody Samuelson, Psy.D., opined that defendant did not present a substantial danger of physical harm to others because he had not been physically aggressive with people. She acknowledged that in 1995, defendant, who was off his medications, attempted to hit jail officers with a pillowcase filled with wet clothes. She agreed that if defendant stopped taking his medication, he would decompensate in one to two weeks but still did not present a substantial danger since his history included only one instance in 1995 of attempting to harm anyone. Samuelson opined that defendant would take his medication and see a psychiatrist even if released without CONREP supervision since he is medication compliant and committed to being mentally stable. She agreed defendant would face stressors if released in the community and that defendant's symptoms would return if he went off his medications. Samuelson had not seen an October 2011 psychiatric progress note reporting defendant's delusional statement that a parole agent had raped and killed his girlfriend, that defendant was very angry, and that defendant wished a "natural calamity should befall them to serve karmic justice."

The trial court issued a detailed written ruling, extending defendant's commitment and denying his request for outpatient treatment. After summarizing the procedural history and the witnesses' testimony, the trial court concluded that defendant "has and will have serious difficulty in controlling his dangerous behavior if released," noting Dr. Auluck's testimony that "it will be impossible for [defendant] to disassociate himself from the Mormon Church as it has historically been a large part of [defendant's] [social] life." The court found that defendant "has never been able to control his infatuation, disdain and pervasive if not perpetual course seeking revenge on the Mormon Church and associated persons" and that "[h]is current residual symptoms include continuing paranoia from perceived mistreatment including allegedly by the Mormon Church." The court concluded that defendant had failed to prove the affirmative defense that he could

7

control his mental condition through the very high doses of medication he currently took, considering the fact that on CONREP supervision, defendant had failed to be medication compliant at all times and failed to self-report his failure to take prescribed medications for days at a time. The court also cited Rubel's testimony that despite the highest levels of supervision possible on CONREP, defendant had become psychotic and written the threatening letter to the president of the Mormon Church. The court also noted Dr. Auluck's testimony that defendant would decompensate within one to two weeks if he failed to take his medications as prescribed.

## DISCUSSION

Defendant contends there is insufficient evidence that he (1) presents a substantial danger of physical harm, and (2) lacked the volitional capacity to control dangerous behavior. We conclude sufficient evidence supports both findings.

Commitment to a state hospital under Penal Code section 1026[1] may be extended only if the defendant was committed for a felony and "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) Section 1026.5, subdivision (b)(1) requires "proof that a person under commitment has serious difficulty in controlling dangerous behavior." (*People v. Galindo* (2006) 142 Cal.App.4th 531, 533, 536-537 [applying the holding in *In re Howard N.* (2005) 35 Cal.4th 117, which interpreted Welf. & Inst. Code, § 1800 et seq. as containing the requirement]; *People v. Bowers* (2006) 145 Cal.App.4th 870, 878 (*Bowers*).)

" ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.] "In

---

[1] Undesignated statutory references are to the Penal Code.

8

reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5[, subdivision] (b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*Bowers, supra,* 145 Cal.App.4th at pp. 878-879; accord, *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.)

Here, Dr. Auluck testified that defendant posed a substantial danger of physical harm to others in view of defendant's mental health history, his 1995 offenses, and Rubel's testimony concerning defendant's behavior and comments while on CONREP supervision during which defendant became psychotic. Defendant was diagnosed with schizoaffective disorder of the bipolar type, a major psychiatric mental disorder, due to which defendant has grandiose and paranoid delusions and that, even though controlled with medications, defendant still had some grandiosity and believed he had been mistreated by his church. When asked whether defendant had a mental disorder that rendered it seriously difficult for him to control his dangerous behavior, Dr. Auluck noted defendant's impulsivity and that, without supervision to remind him to take medications, his symptoms would return quickly without the medications. Even the defense expert agreed and acknowledged defendant's 1995 act of aggression/violence when he was off his medications (attempted to hit jailers with a pillowcase full of wet clothes).

The evidence established defendant posed a substantial danger of physical harm to others and has a mental disorder that, by its very nature, causes him to have serious difficulty controlling his behavior. As a result of his mental disorder, defendant has grandiose and paranoid delusions he cannot completely control with medications. He

9

presents a danger to the physical safety of others, as evidenced by his threats against the president of the Mormon Church. Sufficient evidence supports the trial court's order extending defendant's commitment.

We also conclude that the trial court did not abuse its discretion in denying defendant's request for transfer to outpatient treatment.

" 'Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' " (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 (*Sword*).)

The trial court determines whether the defendant "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (§ 1026.2, subd. (e).) The "defendant has the burden of proving [at an outpatient status hearing], by a preponderance of the evidence, that he is either no longer mentally ill or not dangerous." (*Sword*, *supra*, 29 Cal.App.4th at p. 624.)

A defendant may be released on outpatient status upon the recommendation of the director of the state hospital and the community program director if the court approves after a hearing. (§ 1603.)

"The release decision is not solely a medical or expert decision. The court's role is to apply a community standard to the release decision . . . not to rubber-stamp the recommendations of the . . . doctors and the community release program staff experts." (*Sword*, *supra*, 29 Cal.App.4th at p. 628.) The recommendations are "prerequisites for obtaining a hearing," but the trial court has discretion to approve or disapprove the recommendations. (*Ibid*.)

10

Orders denying outpatient status are reviewed under an abuse of discretion standard.  (*Sword*, *supra*, 29 Cal.App.4th at p. 619, fn. 2; *People v. Henderson* (1986) 187 Cal.App.3d 1263, 1267-1268, 1270.)  "Discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered."  (*Henderson*, *supra*, at p. 1268.)

Rubel was willing to accept defendant back into CONREP *provided* he developed a written plan for dealing with church members but he had not done so.  Dr. Auluck believed it would be impossible for defendant to stay away from the church because defendant wanted the social life the church provided.  At the time of defendant's offense, he was having delusions that were religious in nature.  He became psychotic even while on CONREP supervision and wrote a threatening letter to the president of the Mormon Church.  The trial court provided legitimate reasons supported by the record for denying defendant's application for outpatient release.  We do not find any abuse of discretion.

## DISPOSITION

The order extending defendant's commitment to June 27, 2014, is affirmed.  The order denying outpatient treatment is affirmed.


        BUTZ        , J.


We concur:


     ROBIE      , Acting P. J.


     MAURO      , J.

11