Filed 1/25/24  P. v. Escamilla CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JULIO OMAR ESCAMILLA,<br><br>    Defendant and Appellant. | A165106<br><br>(San Mateo County<br>Super. Ct. No. 17-NF-012420-A) |

Julio Omar Escamilla was committed to Napa State Hospital in 2019, after pleading not guilty by reason of insanity to charges of attempted murder and assault.  He appeals from the trial court's denial of his petition for transfer to an outpatient treatment facility.  Escamilla contends the trial court abused its discretion by ignoring undisputed evidence of his rehabilitation and applying an incorrect legal standard.  We affirm.

**BACKGROUND**

**I.**

***Procedural Background***

On October 14, 2017, while "reportedly psychotic with delusions and command hallucinations," Escamilla stabbed two women at a board and care home where he was staying.  He was charged by information filed in March 2019 with two counts of attempted murder (Pen. Code, §§ 187,

1

subd. (a)/664)[1] (counts 1 and 3) and two counts of assault with a deadly weapon (§ 245, subd. (a)(1)) (counts 2 and 4). It was alleged in connection with each count that Escamilla personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)), and in connection with the attempted murder counts that he personally used a deadly weapon (§ 12022, subd (b)(1)). The information further alleged that Escamilla had served two prior prison terms within the meaning of section 667.5, subdivision (b).[2]

On October 7, 2019, pursuant to a negotiated plea agreement, the parties stipulated that Escamilla was not guilty by reason of insanity on the attempted murder counts and the court, based on the stipulation and doctors' reports it had reviewed, found Escamilla not guilty by reason of insanity (NGI) on the two counts, which were clarified to be attempted second degree murder. The other counts and the enhancement allegations were stricken. On October 30, 2019, the court ordered Escamilla committed to the Department of State Hospitals for a maximum period of 11 years and four months.[3] He was admitted to Napa State Hospital (Napa) on January 30, 2020.

---

[1] All further statutory references are to the Penal Code.

[2] The complaint was filed in October 2017. Escamilla was found incompetent to stand trial (§ 1368) on February 14, 2018. On January 16, 2019, he was found competent to stand trial and criminal proceedings were reinstated.

[3] At the hearing on October 7, 2019, in accordance with the plea agreement, Escamilla first entered guilty pleas to the two counts of attempted murder with the understanding that the court would then accept the parties' stipulation that he was not guilty by reason of insanity. The court subsequently determined this was not the proper procedure and on May 13, 2020, held proceedings to correct the procedure, reinstate the NGI pleas and amend its orders nunc pro tunc.

On March 26, 2021, Escamilla filed an in propria persona petition for transfer to outpatient treatment (§ 1026.2). The court appointed counsel for Escamilla and subsequently, on September 22, 2021, ordered Napa to evaluate him and submit a recommendation as to whether he "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community" (§ 1026.2, subds. (e), (*l*)). Napa's report, dated October 14, 2021, recommended that Escamilla not be placed in an outpatient treatment program.

Trial on the petition began on March 22, 2022, and continued over the course of six court days. On April 13, 2022, the court denied the petition.

Escamilla filed a timely notice of appeal on April 25, 2022.

## II.

### *Evidence Bearing on the Petition*

### A. Factual Background

As described by Escamilla at the hearing and in his medical records and the medical testimony, Escamilla has a long history of substance abuse and mental illness. He first drank alcohol at age 8, began drinking regularly at age 13, smoking marijuana at age 15 and using cocaine frequently at 18. He reported severe consumption of alcohol (" 'four 40 oz. beers daily, seven days a week" and "eventually . . . about a gallon of Takka Vodka daily seven days a week' "), cocaine (" 'daily for seven years' "), marijuana (a gram daily, to reduce cravings for alcohol and cocaine and self-medicate for anxiety) and methamphetamine (" '200 times in seven years in between cocaine use' "), with related overdoses and hospitalizations as well as criminal offenses and social and financial problems. He reported that "drinking 'brought out aggressive behaviors'" and cocaine would make him " 'extremely paranoid.' "

3

Escamilla's history of paranoia and delusions began at age 15 and he started taking an anti-psychotic medication in high school. He also had an extensive record of arrests and prosecutions, including conspiracy to commit crimes, substance-related offenses, burglary, petty theft, domestic violence, assaults, violation of restraining orders, identify theft and forgery; he estimated he had been arrested more than 50 times, with nearly all of the arrests " 'associated or committed under the effects of drugs or alcohol.' "

Prior to the commitment offenses, Escamilla had been off his medication for three years, having previously taken it since age 15 without stopping for more than a month, and he had been clean and sober for six months. He reported that he stabbed the women in fear for his life, hearing voices telling him to stab them because they were trying to kill him, and that he "never heard voices nor saw things that weren't there until six months prior to getting arrested on the day of [his] committing offense."

The expert witnesses for both parties agreed that Escamilla suffered from schizophrenia[4] and four substance use disorders (alcohol, cocaine, cannabis, amphetamine).[5] They disagreed on whether Escamilla also suffered from antisocial personality disorder and anxiety disorder. One of the

---

[4] The People's witness Dr. Sabina Correa diagnosed "[s]chizophrenia, with catatonia" and defense witness Dr. Christopher Fisher agreed. Defense witness Dr. Joel Mostow testified that Escamilla's primary diagnosis was "unspecified schizophreniform spectrum and other psychotic disorder"; the People's witness Dr. Daniel Ferster agreed that this is Escamilla's "diagnosis of record" and testified that the current treatment team had not yet further refined the schizophrenia diagnosis.

[5] Specifically, these diagnoses were alcohol use disorder, severe, in full remission, in a controlled environment; cocaine use disorder, severe, in a controlled environment; cannabis use disorder, moderate, in a controlled environment; and amphetamine-type substance use disorder, moderate, in a controlled environment.

People's experts diagnosed him with the former and believed the latter required consideration, the other believed both diagnoses should be considered further; and the defense experts believed neither of these diagnoses applied.

The witnesses for both parties agreed that since his admission to Napa on January 30, 2020, Escamilla had not had conflicts with others, engaged in acts of aggression or violence, or received disciplinary referrals for violation of hospital policies or procedures; had not displayed symptoms of psychosis; and had been compliant with medication and actively involved in treatment.

**B. Napa's Report**

Napa's report submitted in response to the trial court's order under section 1026.2, subdivision (*l*), authored by Sabina Correa, Psy.D., recommended that Escamilla not be placed in a forensic conditional release program (CONREP) for outpatient treatment because "he would be a danger to the health and safety of others, due to mental defect, disease, or disorder, even while under supervision and treatment in the community."

In addition to the diagnoses of schizophrenia and substance abuse disorders, Dr. Correa concluded that Escamilla met the criteria for antisocial personality disorder due to his "pervasive history of rule-breaking" beginning at age 14, when he was arrested for possession of a deadly weapon (a butterfly knife), and "failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest." "Consideration of unspecified anxiety disorder" was suggested because extensive review of Escamilla's records indicated he had suffered from "a form of anxiety" since age eight and at the hospital he had been trialed on many anti-anxiety medications with "minimal effectiveness." Correa recommended "a thorough diagnostic differential assessment to

5

determine the relationship between chronic and often unremitting anxiety as it relates to [paranoia] and schizophrenia," noting that when Escamilla was anxious in the past he had "stopped his medications and self-medicated with illegal substances resulting in criminal and violent behavior."

Medical records since Escamilla's admission reflected issues with depression and anxiety and multiple requests to adjust medications, but no active symptoms of psychosis. Escamilla told Correa he had not experienced delusions or hallucinations since February 2019, which he attributed to a change in his medication.[6]

Escamilla "reported a pervasive history of violating rules when placed in a lower level of care" and said he had been in inpatient substance abuse treatment 10 times. His current relapse prevention plan included a "commitment to 'never hanging around anyone drinking or using or who are drunk or high" and to continue taking his psychotropic and other medications for the rest of his life; he intended to attend AA/NA meetings indefinitely. His discharge plan, similarly, was to stay sober and continue taking his medication. He explained that his medication eliminated his hallucinations, delusions, depression and anxiety, and he did not want his mental health to deteriorate or to hurt anyone or break the law again. When asked what he was working on with his treatment team, he said he did not feel he needed to change much " 'because I'm already doing the right things,' " but " '[i]f CONREP or someone tells me to do something I'll do it.' "

While recognizing Escamilla's prosocial and cooperative behavior and engagement in treatment, and that his "insight into his mental illness

---

[6] Medical notes indicated that Escamilla reported auditory hallucinations for two to three days in March 2020, then began taking Invega (a psychotropic medication) and reported feeling better. He switched from the oral form of the medication to long-acting injections in October 2020.

continues to improve," Correa stated that Escamilla had a "poor history of compliance with community requirements" and, if he decompensated, he was "likely to fail to report or comply with CONREP requirements." His support system appeared to be "minimal."

CONREP had last evaluated Escamilla in July 2021 and found he was not ready for discharge to the community. The CONREP evaluator, Dr. Cleary, noted that Escamilla was continuing to make "good progress in his treatment program," was "behaviorally stable" and medication compliant, was not exhibiting psychiatric symptoms and was "able to demonstrate an understanding of [how] psychiatric instability increases his risk for future violence." In order to "ensure psychiatric stability before leaving the structure of the hospital setting," however, CONREP typically requires an individual to be stabilized on medication for at least six to 12 months, "without any changes or adjustments, prior to being considered for discharge to COT (Community Outpatient Treatment)."

Correa's report concluded that although Escamilla had "made significant progress in his treatment within the hospital, he continues to require inpatient care for continued psychiatric stability." Correa stated that Escamilla's "life-long pattern for rule-breaking, violence, and disregard for the safety of the community" began "shortly after the onset of psychiatric symptoms" and was "consistent throughout his life up until his current hospitalization." She attributed "[t]his pause of criminal behavior" to "the highly controlled and highly structured setting of the state hospital as well as the ongoing psychiatric treatment including constant access to nurses and medical specialists." Correa viewed Escamilla's "long history of violating . . . parole and probation" as "consistent with his pervasive maladaptive personality structure" and stated that "[h]e is highly likely to

7

relapse and decompensate at a lower level of care, or worse, in the community without services."

The report noted that the Forensic Quality Review Panel (FQRP) was to review Escamilla's case on November 19, 2021. The FQRP is a "multidisciplinary, multifaceted second-level review that seeks to identify potential risk factors and ensure proper actions are implemented to address them" and issues a set of recommendations to the treatment team. Once the recommendations were adequately addressed, the treatment team would ask the FQRP to review the case and readiness for community placement.[7]

Subsequent to Correa's report, the FQRP review identified seven "action items" to be addressed before Escamilla would be considered ready for outpatient treatment. As described in the testimony at trial, these were to clarify Escamilla's diagnoses; consider appropriate medication for his anxiety pending the outcome of action item 1; assist Escamilla in improving his insight into past relationships characterized by domestic violence and his relationship to violence generally; help Escamilla develop a plan to address triggers and risk of violence in a congregate living facility; continue to support Escamilla's maintenance and substance abuse recovery (including creating a time line linking substance use, mental health symptoms and violence and enrolling in a specified program to address "socialization,

---

[7] Correa explained in her testimony at trial that the FQRP process is separate from the hospital's response to a patient's petition; while the writ proceeding requires the hospital to provide a formal opinion on dangerousness, the purpose of the FQRP process is to "provide a guide for remaining treatment." The FQRP process was automatically triggered when Escamilla was placed on a "level 2 transition unit" and required Correa to conduct an assessment and present it to a panel consisting of a panel chair, the chief and deputy chief of forensic services, the supervisors for the patient's treatment team and sometimes "ancillary folks such as substance abuse" and a CONREP liaison.

criminal thinking and co-occurring disorders"); explore the role of antisocial personality disorder in his history of violence and as a barrier to genuine engagement in treatment and recovery; and clarify with him realistic community supports and family relationships.

## C. Escamilla's testimony

Escamilla testified that he believed the treatment he was receiving at Napa was helping him and he would not be a danger to people in the community if released. He expressed great remorse for his commitment offenses and repeatedly stated that he was committed to taking his psychotropic medication and not using alcohol or drugs because he did not want to be a danger to anyone again. He believed that the drugs and alcohol he had used over his lifetime worsened his schizophrenia, knew he had to stay sober to prevent becoming dangerous and knew he had to take his medication so he would not decompensate and start using drugs to self-medicate.

Escamilla testified that the "warning signs" for an onset of his schizophrenia would be if he started to have "weird thoughts or feelings of persecution or paranoia or delusions, major hallucinations and audio hallucinations." His first symptoms were usually delusions and "symptoms of being persecuted." In his Forensic Relapse Prevention Plan (FRPP),[8] he identified his "high risk situations" as stopping his medication, being around someone "drinking or using," and slowing down on or stopping his AA meetings. His plan, if he started to experience symptoms after being released to supervised conditional outpatient treatment, was to immediately call 911,

---

[8] Development of a patient's FRPP is an ongoing process in which the patient submits a plan to the treatment team and receives feedback for improving it.

report to CONREP staff, or go to the nearest hospital and ask for help, and to contact his attorney and his family. He intended to participate in all therapy, counseling and substance abuse treatment programs requested by CONREP and to attend AA meetings.

Escamilla testified that he noticed a decrease in his anxiety and depression immediately after he started taking Invega; he asked to discontinue the Celexa he had been taking for anxiety and depression and did not notice any increase in either after he stopped this medication. He had completed six months of "substance recovery maintenance" on the discharge unit in addition to three months he had done on another unit.

Escamilla had stopped taking a prior psychiatric medication in 2014 because a psychiatrist in the county jail thought he should try doing without it. When he started having symptoms again, he thought they were symptoms of anxiety and sought treatment for that; since the doctor had stopped his medication, he thought he was "fine for schizophrenia." He received outpatient mental health treatment after being released from jail, but no one suggested he re-start his medication. At the time of his offenses, he did not realize he was experiencing hallucinations, but he now agreed that he stabbed the women due to severe symptoms of schizophrenia and was not able to control his violent behavior. In the future, he would not follow any advice to stop taking Invega.

Escamilla testified that he had not discussed how his past family relationships might impact his mental illness with anyone on his treatment team but talked to his psychiatrist about getting a therapist to discuss this. He testified that he was abused by his parents and had had trouble in in romantic relationships, explaining that he had been in "abusive relationships" in which "females . . . physically abuse me" and relationships

10

where "she hasn't been sober and . . . has made it harder for me to remain sober." He acknowledged one occasion when he "got a domestic violence charge for being drunk and hitting" a girlfriend. He testified that "[o]nly a couple" of his past offenses involved violence and that they were caused by his drinking and drug use.

### D. Defense Witnesses

#### 1. *Dr. Joel Mostow*

Joel Mostow, M.D., a staff psychiatrist at Napa who was Escamilla's primary psychiatrist from January 2021 until late 2021, testified that Escamilla's mental illness had been in remission since his admission. Remission "is generally considered the most realistic treatment goal" for psychiatric illness; " 'recovery' " in the sense of "cured" "does not often happen." Escamilla was receiving long-acting injections of Invega and did not report any side effects. He had previously been taking Celexa, an antidepressant with strong antianxiety properties, and did not display increased anxiety or depression after being weaned off it.

Escamilla was polite, respectful and cooperative on the unit, participated fully in his psychiatric rehabilitation and did not exhibit psychotic symptoms or mood lability. When Mostow evaluated Escamilla for the October 2021 court report, Escamilla denied any acute mood symptoms, suicidal or homicidal ideation, hallucinations, acute paranoid ideation or acute anxiety symptoms; he was calm, cooperative and in no distress, with normal speech and affect, and Mostow did not detect any thought disorder or cognitive defect. Escamilla's mental status was consistent with what Mostow had seen during the prior six months on the unit. By contrast, at the time of Escamilla's offenses, he was described as aggressive, agitated and delusional, with disorganized speech.

Mostow testified that Escamilla had good insight into his mental illness and understood how his psychiatric symptoms contributed to his offenses and the importance of medication and continuing to take it in the community. He also understood and appeared to have internalized that if he began to use substances again, he would be at risk of relapsing into psychosis and becoming dangerous. Mostow testified that returning to substance abuse could be a trigger for decompensation and had stated in the October 2021 report that Escamilla would need intensive substance use treatment to adequately prepare for the triggers and barriers he would face on release. Mostow assumed this treatment would be an important part of Escamilla's program in the discharge unit.

Mostow did not diagnose Escamilla with antisocial personality disorder or anxiety disorder; he found Escamilla's conduct on the unit to be prosocial, and there was no adverse effect on Escamilla's anxiety when he stopped taking Celexa.

Escamilla was transferred to the discharge unit in late 2021, at the recommendation of Mostow and Escamilla's other treating providers.[9] Mostow explained that the discharge unit is the "highest tier" in the rehabilitation program, the unit before discharge to the community. Patients in this unit have progressed through other units where they have fewer privileges. In the discharge unit, they are expected to participate even more intensively in rehabilitation and demonstrate to the treatment team that they "really understand their illness and its impact on their offense." Mostow

---

[9] Mostow acknowledged that he would have filed a Community Outpatient Treatment referral to the forensic unit if he had determined Escamilla was ready for outpatient treatment but explained that this was "not often done on a transition unit"; it was customary for a patient to progress through the units, including the discharge unit.

12

had not been involved in Escamilla's treatment since October 2021 and was not involved in the forensic review conducted to evaluate Escamilla pursuant to pursuant to his petition. He testified that whether a person has remained in remission and behaviorally stable for long enough to be ready for release to community supervised conditional outpatient treatment is a judgment made by the discharge unit's treatment team.

### 2. *Dr. Christopher Fisher*

Clinical psychologist Christopher Fisher testified as an expert in psychology, forensic psychology, diagnosis and treatment of mental illness and evaluation of individuals with respect to the section 1026.2 criteria. Fisher had worked at Napa as a unit psychologist from 2007 to 2012. After reviewing Escamilla's records and evaluating him at the request of defense counsel, Fisher opined that Escamilla would not be a danger to the health and safety of others if granted conditional outpatient treatment through CONREP.

Fisher testified that in their two and a half hour meeting in November 2021, Escamilla was polite and respectful and showed linear and organized thought processes, a good memory and no evidence of mental disorder. He appeared to have detailed knowledge of his history that was consistent with what Fisher had seen in his medical records. He had a thorough understanding of his mental disorder and the role of his alcohol and drug use in exacerbating his schizophrenia and was very committed to maintaining his sobriety.

Fisher disagreed with Correa's antisocial personality disorder diagnosis because he thought Escamilla's historical antisocial behavior was a function of his schizophrenia and substance abuse disorders rather than an inherent antisocial personality. He testified that the antisocial personality disorder

13

diagnosis was contradicted by the prosocial activities reflected in Escamilla's records, including not just being polite and kind but attending and embracing treatment assignments, taking medication without incident, maintaining an occupational assignment with "nothing but positive reviews of his work," and having appropriate relationships with peers and staff. Fisher also disagreed with the suggestion that Escamilla might have an anxiety disorder separate from his schizophrenia because his anxiety stopped once the schizophrenia was appropriately treated and did not return when he was taken off antianxiety medication.

Fisher conducted an "HCR-20 risk assessment," which he described as a "structured professional judgment instrument" based on historical risk factors, clinical current risk factors and future-oriented risk management factors. He concluded that Escamilla's risk of violent re-offense while in CONREP was low. Although Escamilla had a lot of historical risk factors for violence, the current factors (lack of insight, violent ideation, symptoms of a major mental disorder, instability, and resistance to treatment) were all to the contrary, as were several of the future-oriented factors (crisis plan, personal support, treatment and supervision response). For the two areas where Fisher saw potential risk (living situation, stress and coping in the community), he viewed the coping skills Escamilla had developed and the fact that he would be receiving services from and supervised by CONREP as minimizing the potential risk.

Fisher did not consider the "action items" identified by the hospital's FQRP appropriate prerequisites to conditional outpatient therapy. He did not believe there were issues with Escamilla's diagnoses or medication that still needed to be resolved, and the other action items in his view had already

14

been satisfied, could easily be resolved or were not relevant to Escamilla's current dangerousness.[10]

Fisher also opined that Escamilla had satisfied the individualized recommendations and general readiness guidelines discussed in the CONREP liaison's report.[11] In particular, Escamilla had already been on the discharge unit for more than six months, his FRPP, as compared to the 40 or

---

[10] Fisher agreed with the diagnosis of schizophrenia with catatonia, disagreed with the diagnoses of antisocial personality disorder and anxiety disorder, and thought questions about anxiety medication had already been answered. He viewed improving insight into past domestic violence as an ongoing treatment issue, not as a prerequisite to outpatient treatment, and did not think possible placement in a board and care facility was of concern because the fact that Escamilla's offense occurred at such a facility appeared to be a coincidence. Supporting Escamilla's substance recovery was not a legitimate basis for finding he was not ready for outpatient treatment because it was something for the treatment team to do, not Escamilla. The item regarding exploration of the role of antisocial personality disorder, by presuming the existence of the disorder, conflicted with the item seeking consideration of this diagnosis and Escamilla's records showed no barriers to treatment. Finally, Fisher thought Escamilla would be able to explain his relationships with his mother and sister, and how they would support him, in a ten-minute conversation.

[11] The individualized CONREP recommendations called for Escamilla to engage in the hospital treatment program and successfully reside on a discharge unit for at least six months to one year; demonstrate an adequate relapse prevention plan for dangerousness and substance abuse; demonstrate psychiatric and behavioral stability; and identify triggers and warning signs for psychiatric decompensation. The readiness guidelines that CONREP applies to all candidates for outpatient treatment specify that the individual must have no physical aggression except in self-defense in the last nine to twelve months, voluntarily comply with the treatment plan for at least six months, participate in creating a FRPP, have adequately controlled symptoms of mental illness, agree to CONREP's terms and conditions, and adequately understand the commitment offense, including the role of mental illness and substance use in that offense and in their risk of dangerousness.

15

50 such plans Fisher had reviewed when he was at Napa, was "among the best" because it was "comprehensive" and "personal and individualized," and Escamilla had identified the triggers for and warning signs of psychiatric decompensation in his evaluation, his FRPP and his testimony.

### 3. *Dr. Korpi*

Douglas Korpi, a clinical and forensic psychologist who had been a CONREP director from 1988 to 2000, reviewed Escamilla's records, interviewed him in January 2022 and concluded he would not be a danger to others under supervision and treatment in CONREP. According to Korpi, Escamilla was "one of the top folks" and "more ready than most of the people that we think are ready" for outpatient treatment.

Korpi testified that Escamilla's violence and anxiety were results of his schizophrenia. Despite Escamilla's long history of arrests, he was "not a criminal guy"; he did not appear to be antisocial and in fact the absence of any aggressive or violent conduct at Napa was "unusual" and "rather remarkable." Escamilla's medication was effective, he was "believably compliant" in taking it and he understood how it helps him and said he felt "blessed" to be taking it. Escamilla expressed what Korpi believed to be genuine remorse for his offenses, understood how his hallucinations, paranoia and substance abuse together caused his "wrong frame of mind," "hate[d] that he became violent" and realized his medication was what kept him from being violent. He was "enormously cooperative" with treatment and supervision, and Korpi believed this would continue in outpatient treatment. Korpi testified that Escamilla's FRPP was reasonable and realistic.

16

Like Fisher, Korpi testified that the FQRP's action items had been satisfied or were not relevant.[12]  Korpi also believed that Escamilla met or exceeded each of the CONREP individualized recommendations and general readiness guidelines, emphasizing Escamilla's behavioral and psychiatric stability and his understanding of his triggers and what he needed to do to "keep his psychosis in control."

**E. The People's Witnesses**

**1. *Dr. Melanie Cleary***

Melanie Cleary, clinical psychologist and forensic evaluator and hospital liaison clinician for CONREP, had written four reports in Escamilla's case, at six-month intervals, and was present for his FQRP conference.  At the time of her July 2021 report, Cleary determined Escamilla was not ready for discharge to CONREP because he was undergoing medication adjustments and CONREP typically requires that patients be stabilized on medications, including adjustments to dosages or administration schedules, for a minimum of six to twelve months.  Cleary explained that when patients are released too soon after a medication adjustment in the hospital, the change, combined with the stress of returning

---

[12]  Korpi did not understand the action item seeking consideration of whether Escamilla had an anxiety disorder, as taking him off antianxiety medication showed he did not.  Korpi saw past domestic violence as a "nonissue" because Escamilla was not currently violent, and any question about whether he should be discharged to a board and care facility was something for staff to determine.  Korpi did not believe Escamilla needed more substance abuse treatment because he had had "a ton" and this was "not one of the driving issues in this case anymore."  Korpi did not see any indication of glibness or superficial engagement in treatment, and he believed Escamilla's reference to his mother and sister as support individuals was realistic.

to the community, may result in decompensation and an increased risk of violence.

Additionally, while Escamilla had "some understanding" of his triggers for psychiatric decompensation and substance abuse, Cleary felt his understanding could be "further developed . . . to include a variety of both internal and environmental factors that may trigger symptoms or a craving or desire to use substances again." She testified that Escamilla did not demonstrate having a good understanding of his triggers during their interview, although she acknowledged that he identified several triggers, early warning signs and coping methods.[13] Another factor was that Escamilla was "a relatively recent admit" to the hospital and had yet to complete the treatment program, including progressing to a discharge unit and demonstrating the ability to maintain behavioral and psychiatric stability in that less restrictive environment, and neither the FQRP process nor the hospital's independent assessment of readiness for release ("COT" assessment) had yet occurred.

Cleary acknowledged that Escamilla was polite and cooperative when she met with him, he was not depressed or anxious, his thought process was organized and did not reveal active paranoia or delusions. Escamilla was medication compliant and able to accurately list his medications and he

---

[13] Cleary allowed that Escamilla might have included his triggers in his FRPP, but he did not verbalize them or refer to the FRPP during the interview as patients often did. He told Cleary he had completed his FRPP but Cleary did not review it.

During the interview, Escamilla identified depression as a trigger for relapse into substance abuse; not taking medication, using drugs and alcohol and not sleeping much as triggers for psychiatric decompensation; behaving aggressively and slowing down on meetings as early warning signs; and, as coping skills, reading books, calling "someone in recovery," talking to a peer, walking, jogging and weightlifting.

acknowledged the need to continue taking them. He had not had psychotic symptoms since February 2019, was attending all his groups and had no positive tests for drugs or alcohol.

Cleary again determined Escamilla was not ready for discharge to CONREP in her January 2022 report. She did not interview Escamilla for this report and did not talk to his treatment team. The report stated that Escamilla was still undergoing medication changes and the FQRP had identified action items he had yet to meet in his treatment. In particular, there were ongoing questions about the accuracy of his diagnoses and whether additional diagnoses would indicate need for a medication change, and if Escamilla was found to have a personality disorder, this would have to be incorporated into his "insight and relapse prevention planning." Cleary noted that Escamilla had not yet been on a discharge unit for the necessary time and had not completed the COT process. She felt the FQRP's concern about whether Escamilla would be discharged to a board and care facility was significant because placing Escamilla in an environment similar to where his offense occurred might be a trigger for him.

Cleary found that the CONREP recommendation that Escamilla demonstrate an adequate relapse prevention plan was " 'partially met' " and the recommendation that he demonstrate psychiatric and behavioral stability was " 'met and ongoing' "; as to psychiatric stability, there was "some question about his anxiety." The recommendation that he be able to identify triggers and early warning signs for psychiatric decompensation was " 'partially met and ongoing.' "

Cleary acknowledged that Escamilla largely satisfied the general CONREP guidelines but testified that his history of medication noncompliance in the community and significant history of violence were

19

among the factors that the guidelines note may warrant " '[i]ndividualized and more extensive discharge criteria.' " She conceded that at the time of the hearing in March 2022 Escamilla had been stabilized on his medication for the six months to a year minimum stated in the CONREP guidelines, as he had been on three-month injections of Invega since June 2021. She testified, however, that "[w]e definitely prefer to be on the 12-month end of things," the time frames noted in the guidelines are not "hard-and-fast numbers" and readiness is "based on an individual's case."

### 2. *Dr. Daniel Ferster*

Daniel Ferster, a clinical psychologist, had been Escamilla's treating psychologist on the discharge unit for about four months at the time of the hearing. Ferster believed it was appropriate to further investigate whether Escamilla had an antisocial personality disorder because a lot of information in his history pointed to the diagnosis and the treatment team had not ruled it out. Determining whether Escamilla should be diagnosed with antisocial personality disorder would require both a formal evaluation with psychological testing and monitoring his functioning on the unit over time. This process was "in the works."

Ferster testified that the absence of any antisocial conduct at Napa did not necessarily contradict a diagnosis of antisocial personality disorder because the highly structured, monitored setting would permit Escamilla to conform to expectations and not show antisocial behaviors that might appear in a less restrictive setting. Similarly, part of "teasing out and understanding the diagnosis" would involve determining whether Escamilla's expressions of remorse and empathy for the victims were genuine or "saying the words" without "fully integrating that into the personality." Ferster acknowledged that there was no indication in Escamilla's records that any clinician or staff

20

member had ever questioned the genuineness of Escamilla's statements. He also acknowledged that the possibility of an antisocial personality disorder diagnosis was first raised by the FQRP, not a treatment team; the treatment team had discussed the "stark contrast" between Escamilla's "extensive rap sheet" and "what we see in front of us," but had not discussed the possibility of an antisocial personality disorder prior to the FQRP. Ferster acknowledged that one of the diagnostic criteria for the disorder is that "the occurrence of antisocial behavior is not exclusively during the course of schizophrenia."

Ferster believed it was also appropriate to look into whether Escamilla suffered from a separate anxiety disorder because, based on his records and their conversation, anxiety appeared to be "a core feature in his psychological functioning." Escamilla "presents as someone who is feeling anxious" but denies feeling anxious, and past reports indicated he had "underreported" symptoms.

Ferster viewed Escamilla's FRPP as "good for where he is in his level of treatment," but there were areas that could be improved, including insight into his mental illness, the triggers for his mental illness and how it related to his violence risk. The substance abuse sections were "very good" but could use further development "to really understand the overall process of substance abuse" and what drives him to use substances, and to "really articulate his understanding and awareness of the arc of his substance use issues and his plans for mitigating that in the future." Ferster testified that Escamilla's FRPP "relies heavily on himself to detect and intervene should he develop symptoms," which was "great because he's motivated," but since he did not "detect or intervene" with his commitment offenses, "much more" support was needed to help detect and intervene if Escamilla loses the

21

capacity to do this himself.  Ferster also noted that Escamilla talked about posttraumatic stress disorder related to childhood physical abuse, but it was "not clear" how the abuse or "attachment patterns" influence his substance abuse, anxiety, mental illness and capacity to seek help and feel safe.

Ferster described the treatment groups Escamilla was involved in that addressed issues identified in the FQRP action items.  Escamilla also had two pending referrals for individual therapy, one to a general therapist and the other to a "trauma-informed" one.

### 3. *Dr. Sabina Correa*

Correa, the author of the hospital's report recommending that Escamilla not be discharged to CONREP, testified as an expert in forensic psychology, diagnosis of mental illness and risk assessment.  Her primary function at Napa was to conduct risk assessments and complete court reports in section 1026 cases.  Correa testified that Escamilla was proceeding through treatment "at record pace, very quickly" and was "highly motivated" but was not safe for outpatient treatment at this time.

Correa explained that she did not state a formal diagnosis for Escamilla's anxiety because it was not clear whether it was a separate disorder or tied to his schizophrenia.  This question had implications related to risk of violence in that if the anxiety was related to his schizophrenia, it could mean the schizophrenia was not in full remission.  Also, Escamilla had said numerous times that his anxiety was "a direct link to his using substances, which is . . . a precursor for violence" and "self-medicating his anxiety can be very dangerous for him."

Correa was aware of the diagnostic criteria indicating antisocial personality disorder should not be found where the antisocial behavior can be explained by schizophrenia but did not think this applied to Escamilla

because she did not believe he was always symptomatic with schizophrenia when he broke rules and laws. Asked if she was aware of whether other doctors at Napa had diagnosed Escamilla with antisocial personality disorder, Correa replied, "I don't think they have yet." She explained that one part of her job was to serve as a liaison to treatment providers and sometimes when she provided an opinion on behalf of the hospital, "elements of [her] conceptualization" might differ from the treatment team. Part of the review process was to reconcile these differences: The team would either agree and adopt her diagnosis or explain why it disagreed and "go from there." She acknowledged that the action item calling for exploration of the role of antisocial personality disorder, as written, was confusing in appearing to assume the existence of the disorder and explained this as a result of the panel agreeing with her that Escamilla does suffer from the disorder.

Correa testified that Escamilla's history of violence was an important component of assessing his risk because history of violence is directly related to future violence potential. Past treatment noncompliance was another component: He had a history of stopping his medication in the community and of "not being entirely forthcoming with his treatment team about his symptoms." Also, his history of frequent medication adjustment, "given his history of substance abuse, may, at surface level, look suspicious.[14]

Prior to the commitment offenses, Escamilla had been off his medication for three years, having stopped taking it while under the care of a

---

[14] Escamilla told Correa he stopped his medication on purpose when he was in prison (which Correa estimated was around 2010) because he wanted to be alert, given the inherently dangerous setting. Escamilla reported that he did not receive any behavioral reprimands in prison and did not use drugs because he did not want to be in debt to anyone there and because he "found God."

psychiatrist in jail. He had been medication compliant throughout his current stay at Napa, as he had been when he was at the hospital after being found incompetent to stand trial. Correa noted, however, that Escamilla denied hallucinations and said he was only experiencing anxiety during the section 1370 hospitalization, but later told Dr. Fisher that he had been psychotic at that time, and jail records after his return from the hospital reflected symptoms of psychosis including auditory hallucinations and catatonia. Correa concluded that Escamilla was in fact psychotic but "just didn't tell his team."

Correa testified that Escamilla appeared "at first glance" to have a good understanding of "the timeline of events" related to his history of violence, but she questioned whether he had a "deep understanding or appreciation for how the various pieces have worked together to cluster, essentially, at certain points in his life that have led to rule-breaking and violent episodes." Correa noted that when she heard Escamilla's testimony about the domestic violence episodes in his life, she had concerns about "the depth of his empathy for victims," his "not accepting full responsibility for his participation" in those episodes," and ways domestic violence could arise in the future, and she did not feel he was "at a point in his treatment that indicated true remorse and empathy." Correa testified that Escamilla had been "very open that his relationships have been problematic and violent," and if he does not have a deep understanding about how that happened and how to prevent it, she was concerned about the pattern repeating in the future.

Correa testified that the FQRP panel members agreed unanimously on the action items and the conclusion that Escamilla should remain at the hospital for further treatment. The action items were not ranked for importance but in her personal opinion it was important to "firm up"

Escamilla's diagnoses to be sure he was being treated appropriately. She felt the question of his anxiety needed to be resolved because anxiety and substance abuse were "salient factors for [Escamilla's] violence potential" and only two months before she interviewed him, he had reported moderate levels of anxiety and said anxiety was a trigger for him to use drugs in the community and he "wanted to get a better handle on that." Correa did not think the fact that Escamilla did not appear to suffer ill effects from stopping antianxiety medication was sufficient to conclude he did not have an anxiety disorder. She testified, "He is not reporting it, but given his history of also not reporting psychosis when he is experiencing it gives it little weight, in my opinion." Escamilla presented as anxious on the unit and had a long history of being anxious to a degree that interfered with his ability to go to school, talk to people and make friends, and his anxiety was directly linked to his substance abuse and might be related to his schizophrenia.

Regarding Escamilla's support system in the community, his testimony at the hearing that his family was part of his support plan raised questions for Correa about how his past trauma might affect his dynamic with his family, as Escamilla had said he wanted to explore through individual therapy how his childhood trauma may be connected to his current anxiety.

Correa testified that the FQRP panel was very concerned about placing Escamilla in the same setting where his offenses took place because it could be triggering and victim safety planning with regard to this had not yet been addressed. She believed it was necessary to help him develop a more explicit plan to address triggers and violence risk mitigation specific to that environment. Correa believed that Escamilla had "an overview and a general understanding" but was not "at the point where he has a true deep understanding."

Asked about the action item addressing socialization and criminal thinking, Correa testified that she was most concerned with Escamilla's long history of "knowing what he can get away with" and "rid[ing] that line"—for example, using a substance while on probation because he thought he would not be tested for that substance. Noting that Escamilla had told her the biggest reason he was not married was that he "didn't want to be on rules that marriages have," Correa testified that "his aversion for rules as they apply to all elements of society should be further explored."

Correa conducted an HCR-20 risk assessment and testified that she and the FQRP panel agreed on the scoring and Escamilla's risk level. The assessment indicated "a number of risks" placing Escamilla at "an elevated risk of violence if discharged from the hospital even if under the supervision of CONREP." The areas found to be of greatest concern in terms of risk of future violence were his historical antisocial behavior, relationships, substance abuse, major mental disorder and treatment and supervision response, and, with regard to risk management factors, "professional services and plans" and "stress and coping."[15]

Correa believed Escamilla's overall discharge plan was underdeveloped and insufficient to mitigate risk in part because he wanted to go to CONREP,

_____

[15] Correa explained that Escamilla's historical violence was scored as of medium relevance because it was less extreme and pervasive than some other patients, he "does not appear to enjoy being violent as some people do," and violence "in and of itself" was not the "driving force" in terms of future risk. His antisocial behavior, by contrast, included a "varied and pervasive history of disregarding rules and laws and safety for others"; relationships were of concern because "all of his close relationships have had violence in them"; and supervision response was of concern because over the course of his life Escamilla had had trouble adhering to conditions of supervision in the community.

26

but CONREP was not ready to accept him. She stated that "the most successful" Escamilla had ever been was in prison and at Napa, and "[a]ny lesser structure, he does not do well." She was concerned that he had not prepared adequately for stressors he would face in the community and that this would result in a "reoccurrence of his past."[16]

### F. The Trial Court's Ruling

The trial court found Escamilla had not met his burden of proving it was "more likely than not that he does not currently pose a danger to the health and safety of others if conditionally released into the community" because he was "still at risk of suffering a psychotic break when not undergoing intensive treatment in a highly-structured institutionalized setting" and "also at great risk of suffering a relapse into substance abuse." The court noted that it was placing "great weight on the opinions of those providing daily treatment, who unanimously opined that he [was] not yet ready for release into the community, even under supervision and treatment," and that it could not disregard Cleary's conclusion that Escamilla did not yet meet the criteria for release to CONREP, which would be the entity responsible for his treatment and supervision in the community. The court found Cleary's conclusion that Escamilla's progress toward satisfying the release criteria was "ongoing" to be "strongly supported by the facts of his present treatment."

---

[16] Correa opined that Escamilla's decision to file a writ petition "so early on in his treatment" reflected poor judgment. Escamilla was on a lower dose of Invega when he filed the petition than at the time of the hearing, and the fact he thought he was "good enough to leave" was "cause for concern" regarding his judgment about his treatment and what was left to do to properly mitigate his risk of relapse.

27

The court stated that although Escamilla had not had psychotic symptoms for over two years and had been clean and sober for almost four years, "these notable achievements have occurred entirely while he has been institutionalized, living in a highly-structured environment, being provided daily care and monitoring, and while highly motivated by his desire to be discharged. [¶] Once out in the community, he will be faced with the multi-layered stressors of daily living and, as articulated by both Dr. Cleary and Dr. Correa, his insight into his triggers as well as relapse prevention plan need further development."

The court also expressed concern over the need to further explore a diagnosis of antisocial personality disorder, finding it "evident from his almost 20 years of criminal activity as an adult" that he demonstrated "a pattern of criminality which, rather than being derivative of his schizophrenia, is replete with rule-breaking disregard for societal norms and violence." The court found "no convincing evidence in the record" to support the opinion of defense expert Dr. Korpi that Escamilla "only acts out and breaks the law while suffering from symptoms of schizophrenia" and "is simply not a criminal guy."

The court found Escamilla's long history of substance able was of "grave concern" because it had been identified as "one of the more significant triggers of his psychosis" and found Escamilla's FRPP did not adequately address insight or relapse prevention and "seems more aspirational than practical."

The court observed that there would be many triggers for Escamilla upon return to the community and "his development of a coping strategy seems to be in its infancy." In particular, the court noted that one of the three strategies Escamilla had articulated for responding if he experienced

28

psychotic symptoms was to contact his attorney; the court found this of "grave concern" because Escamilla's attorney would have no legal relationship or obligation to act after the current hearing concluded. The court found Escamilla's support network was not sufficiently strong in that there was no evidence what support his mother would provide and his sister was "not in a position to provide much practical support" because she lived in a different county, would not be able to provide a place for Escamilla to stay even temporarily and would not be in a position to "identify quickly any return of psychotic behaviors." The court discussed inconsistencies in Escamilla's FRPP that it saw as demonstrating a "still-evolving level of insight" and noted that Escamilla had "repeatedly returned to behaviors which were both harmful to others and destructive to himself" after "abandoning the tools he learned in treatment or abandoning his medications."

Finding that the evidence "overwhelmingly supports the opinions of Dr. Cleary and Dr. Correa" that Escamilla "is not yet ready for COT," the court denied the petition.

## DISCUSSION

### I.

### *Governing Principles*

"A defendant found not guilty by reason of insanity (NGI) may petition the court to be released from a state hospital prior to the expiration of his or her maximum term of commitment on the grounds of restoration of sanity. (§ 1026.2.) The petition involves a two-step process. The first step is an outpatient placement hearing, at which the applicant must prove by a preponderance of the evidence that he or she will not be 'a danger to the health and safety of others, due to mental defect, disease, or disorder, if

29

under supervision and treatment in the community.' (§ 1026.2, subds. (e), (k).)  If the court makes this finding, the applicant is 'placed with an appropriate forensic conditional release program for one year.' (§ 1026.2, subd. (e).)

" 'The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in "an appropriate forensic conditional release program." ' (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433.)  The applicant again bears the burden to prove by a preponderance of the evidence that he or she will not be a danger due to mental defect, disease, or disorder.  (§ 1026.2, subds. (e), (k).)" (*People v. Diggs* (2022) 80 Cal.App.5th 702, 709.)

The present case involves the first step of this process, when the issue "is whether the applicant would not be dangerous if under supervision and treatment." (*Barnes v. Superior Court* (1986) 186 Cal.App.3d 969, 974.)  At this stage, the applicant is required "to satisfy a significantly lesser test than he or she must meet at the second proceeding, when the issue is whether the applicant would not be dangerous if unconditionally released." (*Ibid.*)

We review the trial court's order for abuse of discretion.  (*People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2 (*Sword*).)  " 'Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion.' " (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900, quoting *People v. Cross* (2005) 127 Cal.App.4th 63, 73.)  " ' "[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." ' " (*Bartsch,* at p. 900.)

## II.

## *Analysis*

Escamilla argues the trial court ignored undisputed evidence that he met all reasonable criteria for conditional release, relied on false and meritless arguments by the People and applied improper standards in denying his petition. We are not persuaded.

### A. The Trial Court's Decision Is Supported by the Evidence.

As detailed above, the record reflects undisputed evidence that during his approximately two years at Napa, Escamilla experienced no psychotic symptoms, did not use alcohol or drugs, engaged in no aggressive or violent conduct, was fully compliant with prescribed medication and actively participated in his treatment program. He consistently expressed remorse for his commitment offenses and intention to continue taking his psychotropic medication and refrain from substance abuse outside the hospital. Escamilla argues the trial court's denial of his petition in light of these undisputed facts creates an insuperable barrier to conditional release that no similarly situated individual could ever overcome.

Despite the agreement of all the witnesses that Escamilla was doing exceptionally well in his treatment at Napa, his treating psychiatrist, the CONREP liaison, Correa (whose job was to assess dangerousness in cases such as Escamilla's) and the unanimous hospital FQRP panel all agreed that Escamilla was not currently safe for discharge to outpatient treatment under CONREP supervision. Their concerns, described at length above, focused on questions about the precise nature of Escamilla's mental disorder or disorders, and therefore the correct treatment for him; his ability to maintain the stability he exhibited in the hospital once outside the structured and monitored institutional setting; and the depth of his understanding as to how

31

his mental disorder, substance abuse and personal background interacted to cause the decompensation and relapses he had suffered in the past.

Fisher and Korpi, by contrast, did not believe the hospital's concerns warranted a conclusion that Escamilla currently would present a risk of danger to others if discharged to outpatient treatment and supervision. In their view, Escamilla's schizophrenia was well-controlled, he was committed to continuing his medication and avoiding substance abuse and he could be expected to maintain his compliance in the community.

Faced with conflicting opinions from medical experts, the trial court necessarily had to evaluate and weigh the competing views. A trial court "is entitled to consider the validity of the opinions presented to it in determining whether defendant met his burden of proving that he was not dangerous." (*Sword, supra,* 29 Cal.App.4th at p. 630.) The court is not required to follow an expert's recommendation as long as its disregard of the recommendation is not arbitrary. (*Id.* at p. 629.)

Two cases illustrate the point. *Sword* upheld a trial court's denial of outpatient status that was recommended by both the state hospital director and conditional release program, even though all the witnesses testified that the defendant was not dangerous, and no witnesses testified to the contrary. (*Sword, supra,* 29 Cal.App.4th at pp. 629, 631.) *Sword* explained that the trial court's reasons for rejecting the witness's recommendations were "legitimate concerns resulting from a thorough review of the testimony and documentary evidence," including that the witnesses did not know or did not consider what would happen if the defendant failed to take his medication as an outpatient and that there were questions as to the stress the defendant might be subjected to as an outpatient and whether the outpatient program could provide sufficient supervision. (*Id.* at p. 630.)

32

*People v. Cross, supra,* 127 Cal.App.4th 63 presents the opposite situation. The trial court in *Cross* also denied outpatient status despite such treatment being recommended by the state hospital and all witnesses testifying that the defendant could be safely treated in the community. *Cross* reversed. Acknowledging that the trial court "was not required to follow the essentially unanimous recommendations of the expert witnesses," the *Cross* court stated that "it could disregard those recommendations only for non-arbitrary reasons." (*Id.* at p. 73.) Unlike *Sword,* in *Cross* the record "revealed no reasons to doubt the adequacy of the experts' knowledge regarding [the defendant's] history or status," the court did not identify "any particular areas of deficiency," and the court's concern that the outpatient program would not ensure the defendant would take his medication was contrary to undisputed evidence about the proposed program (a locked nursing facility). (*Cross,* at p. 74.)

Here, Escamilla was seeking release to outpatient treatment contrary to the unanimous view of the hospital and the CONREP program that he was not ready. "[A]ffirmative expert testimony that defendant is dangerous . . . , even if contradicted by a number of other doctors, [will] support a denial of outpatient status." (*Sword, supra,* 29 Cal.App.4th at p. 630.) " 'Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' (*People v. Wymer* (1987) 192 Cal.App.3d 508, 513.)" (*Id.* at p. 620.)

The trial court explained that it was placing "great weight" on Escamilla's current treatment providers, who were unanimous in

33

recommending against outpatient treatment, and that it "could not disregard" the conclusion of the CONREP liaison that Escamilla did not yet meet the criteria for release. It was neither arbitrary nor unreasonable for the trial court to accept the conclusions of the hospital witnesses that despite how well Escamilla was progressing in his treatment, he continued to present an elevated risk of danger to others. Nor was it unreasonable for the court to weigh heavily the evidence that the program which would be responsible for Escamilla's supervision and treatment concluded he did not meet its release criteria.

Escamilla maintains that the trial court erroneously relied on false arguments and "red herrings" presented by the People. For example, he argues the court's "great concern" over whether he suffered from antisocial personality disorder was misplaced because Correa was the only mental health professional who diagnosed this disorder; the diagnosis was belied by his prosocial behavior at Napa; his antisocial behavior was addressed by his treatment for schizophrenia, which his experts believed encompassed antisocial behavior; and any failure to diagnose a disorder during the two years he was at Napa was the treatment providers' responsibility for which Escamilla should not be held accountable. Similarly, Escamilla contends that concern he might suffer from an undiagnosed anxiety disorder was without merit because his records reflect no such diagnosis and the absence of ill effects when he discontinued anti-anxiety medication shows he did not have an anxiety disorder.

These arguments simply pit the defense experts' views against those of the People's experts. Correa, the FQRP panel and Ferster believed Escamilla might be suffering from antisocial personality disorder even though he did not exhibit antisocial behavior at Napa. Unlike Escamilla's witnesses,

34

Correa did not believe Escamilla's antisocial conduct was solely part of his schizophrenia, because he was not always symptomatic for schizophrenia when he "broke rules and laws." Ferster testified that the absence of antisocial conduct at Napa did not necessarily contradict a diagnosis of antisocial personality disorder because the structured and monitored setting at Napa might allow Escamilla to avoid antisocial behavior that might appear in a less restrictive setting. Ferster also noted that the treatment team had discussed the "stark contrast" between Escamilla's extensive criminal history and his behavior at Napa, although the possible diagnosis of antisocial personality disorder had not been discussed prior to the FQRP. While other providers had not diagnosed this disorder, the evidence indicates that the FQRP process is intended to identify aspects of a patient's illness and need for treatment that may not have been identified by treatment providers.[17] Correa testified that her evaluation pursuant to the FQRP process sometimes differed from the treatment providers' and part of the process was to reconcile such differences.

Escamilla was 37 years old at the time Correa wrote the hospital's report in October 2021 and had a criminal history beginning at age 14. Considering that the conduct of concern with respect to a possible diagnosis of antisocial personality disorder had persisted over more than two decades and abated only when Escamilla was in a structured institutional setting, the trial court's concern that this diagnosis needed further investigation was certainly supported by the testimony of the People's witnesses.

---

[17] According to the hospital's report, the FQRP process involves an "in-depth study and analysis" of the course of the patient's illness and recovery and anticipated areas of risk or interventions, and "serves to identify factors that may be a subtle pattern across his lifespan that may be missed by direct treatment providers."

Similarly, the People's witnesses testified that further exploration of Escamilla's anxiety was warranted. Ferster testified that anxiety appeared to be "a core feature in [Escamilla's] psychological functioning" and that although he denied feeling anxious, he "presents as someone who is feeling anxious" and reports indicated he had "underreported" symptoms in the past. Correa testified that only two months before she interviewed Escamilla, he had reported moderate anxiety and said anxiety was a trigger for him to use drugs and he "wanted to get a better handle on that." She thought Escamilla's anxiety and substance abuse were "salient factors for his violence potential" and did not think the fact that Escamilla did not appear to suffer ill effects from stopping antianxiety medication was sufficient to conclude he did not have an anxiety disorder. Again, the trial court did not abuse its discretion by relying on the opinions of these witnesses rather than the contrary opinions of Escamilla's witnesses.

Escamilla challenges aspects of the trial court's reasoning as "illogical" and indicative of post-hoc justification of a "foregone conclusion." For example, he argues that the trial court's expression of concern over his testimony that he would contact his attorney if he experienced a return of psychotic symptoms "conveniently" failed to mention that he also said he would immediately report the situation to CONREP and seek medical help. The court's comment on this point was one example of its larger concern that Escamilla's FRPP was insufficiently developed, "more aspirational than practical." The court did not suggest Escamilla was relying on contacting his attorney as his *only* strategy; it expressed concern that having this as "one of his three articulated strategies" for coping with a recurrence of psychotic symptoms was not practical.

Escamilla is no more persuasive in suggesting it was illogical for the trial court to find he needed additional substance abuse treatment when his commitment offenses did not involve substance abuse. The trial court considered Escamilla's "long history of substance abuse" to be of "grave concern" because substance abuse was "one of the more significant triggers of his psychosis." Escamilla identified substance abuse as a trigger for psychiatric decompensation and violence. Mostow, one of the defense witnesses, had stated in his October 2021 report that Escamilla would need intensive substance abuse treatment to adequately prepare for the potential "triggers and barriers" he would face on release, and testified that he expected such treatment to be a "very important" part of his treatment on the discharge unit. Although Escamilla had been sober for some four years by the time of the hearing on his petition and had not been using substances at the time of his offenses, the record clearly supports the trial court's concern that recovery from his virtually life-long, severe substance abuse continued to be relevant to his mental health and potential for violence.

**B. The Trial Court Did Not Apply an Improper Standard.**

Escamilla also argues the trial court used an improper standard in denying his petition. As earlier discussed, in seeking conditional release under section 1026.2, Escamilla was required to show by a preponderance of the evidence that he would not be dangerous if released to treatment and supervision in the community. (*People v. Diggs, supra,* 80 Cal.App.5th at p. 709.) Escamilla emphasizes that this is "the lowest standard of proof" and " ' " 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence." ' " ' [Citation.]" (*People v. Ramirez* (2022) 14 Cal.5th 176, 189.) Moreover, Escamilla argues that because he was required to prove only that he was unlikely to cause injury and not that he

37

was "no longer legally insane" (*People v. Williams* (1988) 198 Cal.App.3d 1476, 1480), he did not have to "resolve or negate any possible issues regarding his mental status or condition."

In Escamilla's view, the trial court ignored these principles. He points first to the court's comments that he was "still, in fact, in recovery, not recovered," and that recovery from schizophrenia or substance abuse "is a lifetime commitment," as indicating the trial court erroneously believed Escamilla had to have fully recovered in order to qualify for conditional release. We disagree. The trial court expressly stated that Escamilla's burden was to prove it was "more likely than not that he does not currently pose a danger to the health and safety of others if conditionally released into the community." The remarks Escamilla quotes were part of the court's explanation of why it believed Escamilla had not yet reached the point in his treatment where he would not present a danger to others outside an institutionalized setting. We do not understand the court to have been saying Escamilla would remain dangerous until he was fully recovered but rather that he was still "at risk of suffering a psychotic break" or "relapse into substance abuse" when "not undergoing intensive treatment in a highly-structured institutionalized setting." In essence, the court was explaining why it agreed with the People's experts that despite Escamilla's progress and positive conduct at Napa, remaining concerns about his diagnoses, treatment, understanding of the triggers and warning signs for relapse and plans to cope with the increased stressors he would face in the community meant he still posed a danger to others.

Escamilla considers "illogical" the court's observation that his progress had occurred in a highly structured environment, since the point of the petition was to move to the next step after successful treatment in that

38

environment. This argument begs the question whether the treatment that was successful in the institutional setting was likely to remain successful outside that setting. The People's experts answered that question in the negative and we see no basis for concluding the trial court abused its discretion in relying on their conclusions.

In his reply brief, Escamilla argues that the People's experts and the trial court improperly focused on his past and ignored his current condition and behavior. We agree that section 1026.2 requires consideration of his *current* risk of dangerousness, but the record does not support his assertions that the People's experts and court ignored his improvement. As Escamilla stresses, all the witnesses recognized that during his time at Napa, he was free of psychotic symptoms, did not engage in aggressive conduct, was compliant with medication and treatment and was gaining insight into his mental illness (although Escamilla ignores the fact that the People's witnesses believed his insight needed further development). Indeed, the trial court commended Escamilla on his "tremendous progress" and told him he was "a different person today" than he was when he committed the 2017 offenses.

To be sure, the concerns the People's experts and the trial court expressed about Escamilla's present risk of dangerousness were informed by his past condition and conduct. What Escamilla sees as an improper focus on his past condition and conduct, however, seems to us a necessary consideration. For example, Correa testified that forming her opinion that Escamilla would pose a danger even if under CONREP's supervision involved "reconciling his current presentation and his past," that history of violence is directly related to potential for future violence, and that Escamilla's history of stopping medication in the community and of not being "entirely

39

forthcoming" about his symptoms were also important considerations. As the trial court observed, after "an almost nonstop pattern of substance abuse and criminal activity for almost 20 years, it is surely reasonable to have concerns as to whether the seeds for living amongst society while remaining clean and sober and violence free have sufficiently taken root."

In short, the trial court's decision was supported by expert opinion from Escamilla's treatment providers based on consideration of both Escamilla's current condition and conduct and his history. The trial court found that expert opinion was "overwhelmingly" supported by the evidence and was not persuaded by the defense experts' contrary opinions. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

_____

STEWART, P.J.


We concur.


_____

RICHMAN, J.


_____

MAYFIELD, J. *


*People v. Escamilla* (A165106)

---

     * Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.